era's testimony, Bauer's conviction must be reversed.[6]

## CONCLUSION

Bauer's attorney-client privilege, the oldest and most revered of the legally recognized privileges protecting confidential communications, was violated by the admission of Rivera's testimony at Bauer's criminal trial. Though it does not rise to the level of constitutional error, we do not view the violation of the sacred trust between an attorney and his client as an insignificant occurrence. Given the conclusiveness with which Rivera's testimony rebutted Bauer's sole defense at trial, and the Government's otherwise tenuous evidence of Bauer's criminal intent that is arguably consistent with Bauer's theory of defense, we conclude that the Government has not proven by a preponderance of the evidence that there is a fair assurance that the jury's verdict was not substantially swayed by the admission of Rivera's testimony. We therefore REVERSE Bauer's conviction.

REVERSED and REMANDED for a new trial or other appropriate disposition.

**Rolland Richard HENRY,**
**Plaintiff–Appellant,**

v.

**The COUNTY OF SHASTA; State of California; Jim Pope, as Sheriff; A.C. Chaidez, Officer; and H. Smith, Officer, Defendants–Appellees.**

No. 95–16704.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 12, 1996.

Decided Dec. 23, 1997.

---

Eric Berg, Redding, California, for the plaintiff-appellant.

John K. Hoxie, Deputy Attorney General, Sacramento, California, for the defendants-appellees State of California, A.C. Chaidez, and H. Smith.

Arthur Loyal Morgan, Jr., Halkides & Morgan, Redding, California, for the defendants-appellees County of Shasta and Jim Pope.

Before: BOOCHEVER, REINHARDT, and RYMER, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge RYMER.

REINHARDT, Circuit Judge.

"Take me to your magistrate," Henry insisted, and the battle was on. It seems that Shasta County has a group of zealous citizens intent on ensuring that they and their associates are at all times afforded the full extent of their legal rights—to the last jot and tittle—and that all laws that affect them are strictly complied with, even in the case of minor vehicle code infractions. At the same time, according to the record as we must view it, the sheriff and certain other law

enforcement officers who work in Shasta County take quite a different view of the legal process. As they see it, they are the law in Shasta County.[1]

## I. Facts

At 9:55 p.m. on May 13, 1993, Rolland Richard Henry was stopped by California Highway Patrol Officer A.C. Chaidez because the tail lights on his car were not functioning. Together, Henry and Chaidez checked the automobile's fuses, which they found to be in working order. Chaidez then issued Henry a "Notice to Appear," i.e., a traffic ticket, for the broken tail lights and for failing to wear his seat belt. *See* Cal. Veh.Code §§ 24252(a), 27315(d). When Chaidez asked Henry to sign the ticket, however, Henry refused, explaining that "according to the California Vehicle Code Section 40302(c), [he] had the right for a mandatory appearance before a magistrate to have a judicial determination made at that time and that [he] demanded to be taken forthwith." Chaidez said that no magistrate was available at that

hour. Henry then explained that under California law a magistrate must be available at all times. *See* Cal.Penal Code § 810. In response, Chaidez told Henry that if he did not sign the ticket, he would be arrested and put in jail. When, despite that threat, Henry repeated his demand to be taken to a magistrate, Chaidez radioed Sergeant H. Smith for assistance. When Smith arrived on the scene approximately thirty minutes later, Henry once again stated that he wanted to be taken to a magistrate without delay, in accordance with California law. Smith replied that "it might be the law, but it is not our (CHP) policy," and informed Henry that no magistrate would be available until the following day, so Chaidez would take him to jail if he refused to sign the ticket.[2] When Henry said that he was not refusing to sign the ticket but was instead demanding, in accordance with state law, that he be taken to a magistrate, Smith told him that he was being arrested for a violation of sections 40302(b) and (c) of the California Vehicle Code.[3]

1. Because Henry appeals a grant of summary judgment in favor of the defendants, we must view all factual disputes in the light most favorable to Henry, and for purposes of this appeal, must accept Henry's version of the facts in dispute.

2. Section 40307 of the California Vehicle Code provides that:

When an arresting officer attempts to take a person arrested for a misdemeanor or infraction of this code before a magistrate and the magistrate or person authorized to act for him is not available, the arresting officer shall take the person arrested, without unnecessary delay, before:
   (a) The clerk of the magistrate who shall admit him to bail in accordance with a schedule fixed as provided in Section 1269b of the Penal Code, or
   (b) The officer in charge of the most accessible county or city jail or other place of detention within the county who shall admit him to bail in accordance with a schedule fixed as provided in Section 1269b of the Penal Code or may, in lieu of bail, release the person on his written promise to appear as provided in subdivisions (a) through (f) of Section 853.6 of the Penal Code.
Whenever a person is taken into custody pursuant to subdivision (a) of Section 40302 and is arrested for a misdemeanor or infraction of this code pertaining to the operation of a motor vehicle, the officer in charge of the most

accessible county or city jail or other place of detention within the county may detain the person arrested for a reasonable period of time, not to exceed two hours, in order to verify his identity.
Contrary to Chaidez's and perhaps Smith's statements to Henry, the statute provides for persons taken into custody to be brought *to* a local jail, but it does not provide for them to be put *in* jail.

3. Section 40302 provides:

Whenever any person is arrested for any violation of this code, not declared to be a felony, the arrested person shall be taken without unnecessary delay before a magistrate within the county in which the offense charged is alleged to have been committed and who has jurisdiction of the offense and is nearest or most accessible with reference to the place where the arrest is made in any of the following cases:
   (a) When the person arrested fails to present his driver's license or other satisfactory evidence of his identity for examination.
   (b) When the person arrested refuses to give his written promise to appear in court.
   (c) When the person arrested demands an immediate appearance before a magistrate.
   (d) When the person arrested is charged with [driving under the influence of drugs or alcohol].
As Henry explained to Smith, § 40302 does not define any conduct as criminal and could not be

At that point, Chaidez handcuffed Henry, placed him in the front seat of a patrol car, and drove him to the Shasta County Jail. Chaidez did not give Henry a *Miranda* warning, nor, it appears, did Henry receive one at any time while he was in custody. Upon arriving at the jail at 11:00 p.m., Chaidez told the booking officer that Henry was being jailed for refusing to sign a ticket. Henry renewed his demand to be taken to a magistrate without delay, to which the booking officer responded that Henry would not see a magistrate until the following day. Sergeant Bosenko and Deputy Doyle told Henry that he could either sign a promise to appear and be released on his own recognizance, or post bail, which was set at $76.00. When Henry renewed his request to be taken to a magistrate, he was booked on the charge of violating § 40302(b) of the California Vehicle Code. *See supra* note 3.

A deputy sheriff and a nurse then asked Henry some medical questions. The two would not tell Henry their names and he could not read their name tags because he did not have his glasses with him.[4] Henry stated that he had a heart problem for which he occasionally took nitroglycerin, but that he did not have his medication with him. He also stated that he was not suicidal, that he had never considered suicide, that he had not hit his head or suffered from dizzy spells recently, and that he did not need medical assistance. He refused to answer any other medical questions, however, instead telling his two interrogators that he needed to remain silent in order to protect his rights. He also told them that he would answer any questions asked of him once he was taken before a magistrate. The nurse informed him that his clothing would be removed and he would be placed in a padded medical "safety cell" (i.e., a "rubber room") if he did not answer her questions. Then, at 11:30 p.m., she ordered that he be taken to the hospital for an examination by a physician.

While Henry was at the hospital,[5] his wife had a telephone conversation with the nurse. According to the nurse, Mrs. Henry was belligerent and sounded intoxicated, stated that Henry had a heart condition and other medical problems, and, "[w]hen [the nurse] asked her if he was suicidal, she said that he could be," but she refused to say whether Henry had diabetes or any other serious medical condition or illness. Mrs. Henry's description of the conversation was rather different:

> [The nurse] stated that [Henry] was fine. I asked her why I was talking to her. She stated it was standard procedure for all inmates to be placed under observation. I asked why my husband was being observed since he was fine when he was arrested. She repeated that it was just standard procedure for all inmates.
>
> At no time did she ask me if my husband was suicidal or did she ask me if my husband had ever been suicidal. She mentioned nothing about my husband being at risk of a stroke, heart attack, or highly agitated.

Henry was returned to the jail at approximately 1:00 a.m. He again refused to answer a nurse's medical questions. Although the nurse stated in her declaration that Henry "did not appear to be in any distress," she nonetheless ordered that he be placed in a medical "safety cell." [6] Accordingly, Henry was searched and then taken to the cell—a padded room with no sink or other water supply and no heat. In lieu of a toilet, there was an uncovered hole cut in the center of the cell floor. The only other object in the

---

the basis for an "arrest." Instead, it provides for certain circumstances under which persons "arrested" for non-felony violations of other sections of the vehicle code are to be taken to a magistrate rather than being cited and released.

4.  The record shows that the nurse was Karen Bruce–Parrott, but does not reflect the name of the deputy.

5.  Chaidez handcuffed Henry and took him to the Redding Medical Center in a patrol car. When they arrived, Henry was not violent or unruly,

but he did refuse to cooperate with the examining doctor and nurse, and instead informed them that he was being held against his will.

6.  Henry stated in his declaration that the nurse who gave that order was the same one who had questioned him earlier. Nurse Bruce–Parrott stated in her declaration that she went off duty before Henry's return, however, and Nurse Sharon Denny stated that she was the one who had Henry placed in the cell. Henry, as noted above, was not wearing his eyeglasses at the time.

cell was a plastic mattress thrown on the floor. The cell floor was sticky and had a strong smell of "stale urine." According to Henry, the nurse told two or three deputies "that she wasn't going to fool with [him] and if [he] did not want to answer her questions that she would show [him], and then told the deputies to remove all of [his] clothes." The deputies complied with her orders. After further discussion with the deputies, the nurse ultimately consented to give Henry a blanket. A deputy threw the blanket onto the floor in the far corner of the room. Henry was placed on suicide watch, with "checks" every fifteen minutes,[7] and "remained in that room with [his] feet and body sticking to the urine splattered floor for about 2 and one-half hours." [8]

At that point, two deputies came to get Henry and "paraded [him] through the jail, naked, to the booking cage in full view of male and female deputies and inmates." Henry once again refused to answer any questions or to sign anything until he was taken before a magistrate. He was photographed and then taken back to the "urine-coated" rubber room, where he was left until 9:10 a.m. At that point, a deputy came to the cell, and Henry asked him for a form habeas corpus petition, a pencil, and a magnifying glass (to enable him to see without his glasses so that he could fill out the form).

The deputy just laughed and said, "Yeah right." When Henry stated that he had a right to the materials necessary for preparing a habeas petition, the deputy again laughed at him, announcing "that as long as [Henry] was in that cell that [he] had no rights." The deputy then left, but Henry overheard him telling other officers about the request for the habeas materials. The other officers also laughed loudly when they heard of the request.

Shortly, a different deputy arrived and asked Henry if he knew why he was being held in a padded cell. When Henry said "no," the deputy told him that the reason was because he had refused to fill out the forms and answer the questions presented to him. The deputy then told Henry that "if [Henry] did not sign [the deputy's] paper that [he] would remain in that cell, naked, indefinitely. [The deputy] also told [him] that there would be no appearance before a judge either." Fearing for his health and safety, Henry "agreed under threat" to comply. When he explained to the deputy that he could not see to read—or even to sign—the statement the deputy produced, the deputy placed Henry's hand at the signature line and had him sign the form anyway. Apparently, no one ever bothered to read the statement aloud so that

7. It may be appropriate to state once again that, because this appeal involves a summary judgment order, we must take the facts as the plaintiff asserts them. We might also note, however, that Henry's version of the facts is reminiscent of the lyrics in one of this nation's most popular songs of the Vietnam era:

> After the ordeal, we went back to the jail.
> [Officer] Obie said he was gonna put us in the cell.
> Said, "Kid, I'm gonna put ya' in the cell. I want your wallet and your belt."
> And I said, "Obie, I can understand you wanting my wallet so I don't have any money to spend in the cell,
> But what do you want my belt for?"
> And he said, "Kid, we don't want any hangings."
> Said, "Obie, didja' think I was gonna hang myself for litterin'?"
> Obie said he was makin' sure,
> And, friends, Obie was,
> Cause he took out the toilet seat so I couldn't hit myself over the head and drown.
> And he took out the toilet paper so I couldn't

> bend the bars, roll the toilet paper out the window, slide down the roll, and have an escape.
> Obie was makin' sure,
> And it was about four or five hours later that Alice,
> Remember Alice? It's a song about Alice.
> Alice came by, and with a few nasty words to Obie on the side, bailed us out of jail,
> And we went back to the church, had another Thanksgiving dinner that couldn't be beat,
> And didn't get up until the next mornin', when we all had to go to court.

Arlo Guthrie, *Alice's Restaurant Massacree*, on The Best of Arlo Guthrie (Warner Bros. Records 1977).

When Guthrie sang his historic song at a recent music festival, he observed, "A lot of time's gone by, but not a lot has changed." Tom Knapp, *Further Festival Charms Hershey*, Intelligencer J., July 12, 1997, *available in* 1997 WL 4302994.

8. The prison health service record on Henry notes that he was placed in the "safety cell" to "[rule out] suicidal ideation & to observe."

Henry would know what he was being compelled to sign.

After Henry signed the statement, the deputy told him that "if at anytime [he] refused to sign any and all papers or answer any and all questions to [the deputy's] satisfaction, [he] would find [himself] right back where [he] started, naked and in the urine-coated cell." Only after receiving that additional warning was Henry permitted to take a shower, get dressed, and move to a clean cell. Jail medical records show that Henry spent a total of 9 hours 53 minutes in the "safety cell." Later, Henry was put through the booking process once again, at which point a deputy "reminded [him] what would happen if [he] didn't cooperate fully." A different deputy then told Henry that "if [he] 'pissed off' the judge and came back down to the jail for any other reason than to be released, that [he] would be stripped naked, receive a body cavity search and be placed back in the solitary confinement cell."

At 1:30 p.m. Henry was finally brought before a commissioner, who ordered him released on his own recognizance until his arraignment for the traffic infractions. Henry appeared at the arraignment and at trial, where, on his motion, the charges were dismissed.

On December 30, 1993, Henry filed the instant § 1983 action against the State of California, Shasta County, Jim Pope in his official capacity as sheriff of Shasta County, California Highway Patrol Officers Chaidez and Smith, and unnamed jail personnel. His complaint alleged violations of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights. The named defendants moved for summary judgment, which the district court granted, concluding that: (1) the State of California is not a person within the meaning of § 1983 and is immune under the Eleventh Amendment; (2) Officer Chai-

dez and Sergeant Smith were not liable under § 1983 because they arrested Henry and transported him to the Shasta County Jail pursuant to state law;[9] and (3) Shasta County and Sheriff Jim Pope were not subject to municipal liability under § 1983 because Henry failed to produce any evidence to support either a pattern and practice claim or a deliberate indifference claim. This appeal followed.[10]

## II. State of California

The Eleventh Amendment immunizes states from private damage actions brought in federal court. See *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907–08, 79 L.Ed.2d 67 (1984); *Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198, 201 (9th Cir.1988). Therefore, the grant of summary judgment in favor of the State of California was proper.

## III. Shasta County and Sheriff Pope

A municipal defendant may only be held liable under § 1983 if the unlawful actions of its employees or agents were taken pursuant to that defendant's policies or customs, *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978), including a policy of being deliberately indifferent to the rights of its inhabitants, *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Henry claims that in removing his clothes; placing him in an unheated, urine-coated "safety cell" for a lengthy period of time; repeatedly threatening to leave him in that condition unless he complied with their demands; and ignoring his plea for the materials he needed to prepare a habeas petition, the staff of the Shasta County Jail acted pursuant to a county policy of abusing persons arrested for minor vehicle code infractions who refuse to sign notices to

9. The district court specifically held that the officers acted pursuant to Cal. Veh.Code §§ 40302 and 40307, described *supra* notes 2–3 and accompanying text.

10. Thus, the district court never addressed the questions whether Henry stated a claim or offered evidence that any constitutional violations actually occurred. Because Henry clearly stated a claim of a flagrant Fourth Amendment viola-

tion, and because we conclude that he presented sufficient evidence of the existence of a county policy to survive summary judgment, we need not consider his other allegations at this point, and instead leave it to the district court initially to decide whether he also stated claims under the First, Fifth, Eighth, and Fourteenth Amendments.

appear, or demand to be taken to a magistrate. Alternatively, he urges that the county has a policy of being deliberately indifferent to such conduct by its employees. In granting summary judgment in favor of Shasta County and its policymaker Sheriff Pope (collectively, "the county"), the district court held that there was no evidence that the abuse Henry suffered was inflicted pursuant to a county policy or custom, or that it resulted from deliberate indifference on the part of the county. Upon reviewing the complete record, and viewing the evidence in the light most favorable to Henry, we conclude, to the contrary, that Henry did offer sufficient evidence to give rise to genuine issues of material fact as to whether the county had a policy or custom of flagrantly violating the constitutional rights of persons stopped for minor vehicle code infractions who refuse to sign a notice to appear or demand to be taken before a magistrate, or whether it was deliberately indifferent to such practices by its employees. We therefore reverse the grant of summary judgment as to the county.

Several pieces of evidence in the record go to the question of municipal liability: the declarations of Michael May and Robert Burns, facts recited in Henry's declaration, and a portion of Henry's jail medical record.[11] May and Burns each described being subjected to treatment at the Shasta County Jail virtually identical to Henry's after they were stopped for what were at worst only minor traffic infractions. Henry related that a number of different deputies and nurses, some acting in concert and some independently of one another, all participated in the flagrant violation of his constitutional rights. Jail personnel noted in Henry's medical record that he received the same treatment at the jail in 1986, apparently following his arrest for a similarly minor infraction. Viewing the evidence in the light most favorable to Henry, the declarations of May and Burns,

Henry's statements about the threats and actions of a large number of officials at different times over the course of a night and the following day, and the medical record are sufficient to raise genuine issues of material fact as to the municipal liability claim. We consider each of those pieces of evidence in turn.

Burns in his declaration states that, like Henry, he was arrested in conjunction with a traffic stop for a non-working tail light. The arrest occurred in February or March of 1994, two to three months after Henry filed the instant § 1983 action. The arresting officer took Burns to the Shasta County Jail, where, in response to his repeated requests to see an attorney, he was held naked in a "rubber room" until 1:00 p.m. the following day, when, while on the way to see a magistrate, he was informed that his case had been dismissed, and he was released. It is a reasonable inference—indeed, the only reasonable inference—that after Henry filed suit and successfully served process against the county, it knew about the alleged malfeasance of its employees at the jail. As we will explain more fully below, such "post-event evidence" may be used to prove the existence of a municipal policy in effect at the time that Henry was detained. See, e.g., Larez v. City of Los Angeles, 946 F.2d 630, 645 (9th Cir. 1991) (where allegation was that police chief set tone condoning and encouraging excessive use of force, "we can hardly think of better evidence" than statements he made after incident that were consistent with those claims); McRorie v. Shimoda, 795 F.2d 780, 784 (9th Cir.1986) ("Policy or custom may be inferred if, after [constitutional violations], ... officials took no steps to reprimand or discharge the [prison] guards, or if they otherwise failed to admit the guards' conduct was in error.") (citation omitted). Here, factual issues were presented that the county acted in accordance with an established poli-

---

11. The record also contains the declarations of Deborah Peeples, Terry Peeples, and Daniel Tankersley, all of whom state that they belong to a seventy-five member group that meets regularly to "discuss and exchange information on law subjects," including strategies for asserting their rights when stopped for vehicle code infractions. They further state that members of their group stopped for such infractions are often taken to

jail or threatened with "nasty treatment" in order to coerce them to sign notices to appear. It is not clear from the record whether May, Burns, and Henry are members of the group, though we suspect that they are. We need not consider at this stage whether these declarations are admissible because May's, Burns', and Henry's declarations suffice to give rise to a genuine issue of material fact as to the Monell question.

cy or deliberate indifference to violation of rights by stripping and detaining in rubber rooms persons stopped for minor, non-jailable traffic offenses who refuse to sign a notice to appear, or demand to be taken before a magistrate. There was evidence that the county permitted an almost identical incident as that complained of by Henry to occur after the county was sued and after being put on notice unequivocally of its deputies' and nurses' unconstitutional treatment of Henry.

May's declaration provides further evidence of such a policy. A police officer approached May as he was sitting in a parked car, eating a hamburger. When May refused to cooperate with the officer's demands, he was arrested and taken to the jail. Because he continued to refuse to cooperate, and instead demanded to be taken to a magistrate, the jail staff placed him in a "rubber room." Six officials working together held him on his hands and knees, handcuffed, with "[his] neck forced down on a mattress on the floor," while they removed his clothing. They then left him on the bare mattress, where he lay without a blanket, naked and shivering, all night. Despite his repeated requests to make a phone call, he was held incommunicado in that condition until approximately noon the next day, in violation of both California law and his First and Fifth Amendment rights. *See* Cal.Penal Code § 851.5 (providing that arrestees are entitled to make three completed telephone calls immediately upon being booked); *Carlo v. City of Chino*, 105 F.3d 493, 500 (9th Cir.1997) (holding that Cal.Penal Code § 851.5 gives rise to federal procedural due process interest); *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir.1996) (acknowledging First Amendment right of prisoners to telephone access subject to reasonable security limitations); *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir.1986) (same). May's detention occurred only two and one-half months after Henry's. Such close proximity in time of the two events lends further supports to Henry's claim that his treatment was not an isolated event but was instead inflicted in accordance with county policy.

In holding that the May and Burns declarations may be used to establish municipal liability although the events related therein occurred after the series of incidents that serves as the basis for Henry's claims, we reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry. *See, e.g., Larez*, 946 F.2d at 645. The leading case on the use of post-event evidence in § 1983 municipal liability cases, which we cited with approval in *Larez* and *McRorie*, is *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.1985). In *Grandstaff*, the Fifth Circuit affirmed a jury verdict holding the City of Borger, Texas, liable when members of its police force mistook an innocent person for a fugitive and killed him. At the outset, the *Grandstaff* court noted that isolated instances of official misconduct are insufficient to establish municipal liability under *Monell*. 767 F.2d at 171. *See, e.g., Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). It also recognized that the existence of the city policy at issue—that of deliberate indifference to the "dangerous recklessness" of its police department—must be inferred circumstantially from the conduct of individual officers and the police chief, and then explained that the plaintiffs had failed to point to even a single prior incident of police misconduct to serve as evidence of the existence of such a policy. *Id.* at 171. All that the plaintiffs had proven, the court stated, was that the conduct of the six officers comprising one shift of the Borger police force acted during a single night in ways that displayed a disregard for human life and safety. *Id.* Nevertheless, the court upheld the jury verdict against the city, concluding that the police chief's failure to respond to the situation or to make changes in order to prevent recurring violations evidenced the city's preexisting policy of deliberate indifference to the dangerous recklessness of its police officers.[12] *Id.*

---

**12.** Several circuits in addition to ours have adopted the *Grandstaff* approach. In *Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir.1989), for example, First Circuit noted at the outset that "[t]he [Supreme] Court has never held that inferences about what customs or policies existed in a

Specifically, the *Grandstaff* court explained. that in the aftermath of the shooting,

> there were no reprimands, no discharges, and no admissions of error. The officers testified at the trial that no changes had been made in their policies. If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do ... was not acceptable to the police chief, changes would have been made.
>
> This reaction to so gross an abuse of the use of deadly weapons says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force. The policymaker's disposition, his policy on the use of deadly force, after [the date of the shooting] was evidence of his disposition prior to [that date]. As subsequent conduct may prove discriminatory motive in a prior employment decision, and subsequent acts may prove the nature of a prior conspiracy, so the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy.

767 F.2d at 171 (citations omitted).

If a municipal defendant's failure to fire or reprimand officers evidences a policy of deliberate indifference to their misconduct, surely its failure even after being sued to correct a blatantly unconstitutional course of treatment—stripping persons who have committed minor traffic infractions, throwing them naked into a "rubber room" and holding them there for ten hours or more for failing to sign a traffic ticket or asserting their legal right to be brought before a magistrate—is even more persuasive evidence of deliberate indifference or of a policy encouraging such official misconduct.[13] May's and Burns' declarations are sufficient to show for purposes of summary judgment that such abuse of people who commit minor infractions is "the way things are done and have been done" in Shasta County, and thus would allow a jury to make a finding as to the existence of a policy or custom.

Those declarations are by no means the only evidence Henry has offered to support his *Monell* claim, however. Henry's declaration includes the following facts, among others: (1) a sheriff's deputy not only refused to provide him with the materials he requested in order to prepare a habeas petition—materials to which he had a right under clearly established federal law, *see, e.g., Bounds v. Smith,* 430 U.S. 817, 824–25, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977) ("It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, and with stamps to mail them."); *Straub v. Monge,* 815 F.2d 1467, 1467–68 (11th Cir.) (holding that *Bounds* rights apply to pretrial detainees in county jail), *cert. denied,* 484 U.S. 946, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987); *Leeds v. Watson,* 630 F.2d 674 (9th Cir.1980) (applying *Bounds* with equal force to persons in county jail)— but also repeated the request to various other jail personnel, who merely laughed and did not take any steps to comply with the request; (2) even after Henry ultimately told a second deputy that he would cooperate, and signed the statement placed before him (which he made clear he could not see to

---

city before an event could not be drawn from subsequent actions." *Id.* at 1166–67. Quoting *Grandstaff* at length, it went on to conclude that such inferences were proper. *Id.* at 1167. *See also Black v. Stephens,* 662 F.2d 181, 190–91 (3d Cir.1981) (police chief's failure to institute adequate investigatory procedures for determining when police officers should be disciplined constituted official policy encouraging excessive use of force); *Jones v. City of Chicago,* 787 F.2d 200, 207 (7th Cir.1986) (had prior complaint in companion case not been thoroughly investigated by city, reasonable inference could be drawn re-garding city's deliberate indifference to safety and well-being of patients at public health clinic).

13. We note also that, although there is no record at this stage of the proceedings as to whether disciplinary proceedings were ever held, it does appear from the declarations submitted by the defendants that at least some and perhaps all of the individuals responsible for violating Henry's rights are still employed in their former capacities at the Shasta County Jail.

read and which was not read to him), that deputy twice threatened that if Henry did not continue to cooperate he would be put back in the "safety cell"; and (3) a third deputy later warned Henry "that if [he] 'pissed off' the judge and came back down to the jail for any other reason than to be released, that [he] would be stripped naked, receive a body cavity search [14] and be placed back in the solitary confinement cell."

The continuing threats Henry received from various sheriff's deputies, both before and after he complied with their demands, provide substantial evidence that the jail personnel were acting in accordance with a county policy encouraging or at least condoning flagrantly unconstitutional treatment of persons stopped for non-jailable offenses who refuse to sign notices to appear or demand to be taken before a magistrate. In short, the evidence of the officials' conduct strongly suggests that Henry's treatment resulted from a widespread pattern of abuse by numerous individuals rather than a single instance of mistreatment by a solitary officer. The staff of the Shasta County Jail deals with detainees—including ones who refuse to answer questions and instead assert their rights under federal and state law—on a daily basis. Indeed, dealing with detainees is a, if not the, core function the county entrusts them with performing. In view of all the facts and circumstances of Henry's confinement, there is adequate evidence to suggest that the violations of his constitutional rights were not the result of a few officers acting on a lark or in violation of the orders or policies that governed their conduct. The fact that so many officials participated in the manner they did in the unconstitutional abuse of Henry throughout the period of his detention is thus further substantial evidence in support of his *Monell* claim. *See, e.g., Kibbe v. City of Springfield,* 777 F.2d 801 (1st Cir.1985) (conduct of ten officers, three of whom fired shots, during attempted apprehension of suspect was sufficient to support verdict against city on *Monell* claim).

Finally, there is evidence in the record that Henry himself was placed in a rubber room at the jail in 1986 under substantially similar circumstances. The Prison Health Services record on Henry's detention in the "safety cell" in 1993 includes the following notations:

> [Henry] was placed in [a medical "safety cell"] to [rule out] suicidal ideation & to observe. He appeared to sleep all night. Refused breakfast. Inmate did this in 1986 also. He was arrested because he refused to sign a "fix-it" ticket for a tail-light as it "violates my constitutional rights." He was brought to jail. 1986 he did the same thing. Refused to answer med. questions.

Thus, there is evidence that a county policy of abusing persons stopped for minor infractions who refuse to sign a ticket or demand to see a magistrate by throwing them naked into a "safety cell" had been in existence since at least 1986. It suggests further that the Shasta County officials in charge of the jail consistently act on the premise that persons who insist on the full measure of legal rights in motor vehicle infraction cases are mentally unbalanced.

In sum, we conclude that, individually and collectively, the May, Burns, and Henry declarations along with the official records, are sufficient to raise genuine issues of material fact as to the *Monell* claim. That Henry himself encountered similar treatment some seven years before not only adds weight to his claims but also evidences that the policy was a long-standing one. Therefore, we reverse and remand the district court's grant of summary judgment with respect to the county.

## IV. Officer Chaidez and Sergeant Smith

■ Sergeant Smith (accompanied by Officer Chaidez) (collectively "the officers") informed Henry that he was being arrested for a violation of California Vehicle Code §§ 40302(b)-(c) and for tail light and seat belt violations, both of which are non-jailable offenses for which violators are to be cited and released under California law. *See generally* Cal. Veh.Code §§ 24252(a), 27315(d). They also told him that he would be taken to jail.

---

14. A body cavity search of Henry under those circumstances not only would have been unconstitutional, but also would have violated subsections (f) and (h) of Cal.Penal Code § 4030.

Henry claims that his arrest, transportation, and detention for these infractions violated his Fourth Amendment rights. In other words, as the district court observed, Henry brings an as-applied, constitutional challenge to the officers' conduct under the California statutes. The district court granted summary judgment in favor of the officers on the basis that "Henry was taken into custody and transported to the Shasta County Jail pursuant to state law."

The district court was correct that the officers' conduct in arresting, detaining (until they reached the jail), and transporting Henry to jail was objectively valid under California law.[15] Under California law, "a Vehicle Code violator is technically under arrest when an officer has probable cause to believe that person has committed a Vehicle Code offense, and begins the process of issuing a citation to appear in court." *People v. Monroe,* 12 Cal.App.4th 1174, 1183 n. 5, 16 Cal. Rptr.2d 267, 274 n. 5 (Cal.Ct.App.1993).[16] Furthermore, Henry has failed to offer any evidence refuting the officers' assertion that a magistrate was not available. Once Henry demanded to see a magistrate in lieu of signing the notice to appear, therefore, the officers could, under California law, take him to the county jail. That was a proper course of action under section 40307, which provides that "[w]hen an arresting officer attempts to take a person arrested for a misdemeanor or infraction of [the vehicle code] before a magistrate and the magistrate or person authorized to act for him is not available," the

arresting officer must take the arrestee "without unnecessary delay" before the magistrate's clerk, who is to admit him to bail, or before the officer in charge of the local jail, who may either admit him to bail or release him on a written promise to appear. Cal. Veh.Code § 40307.

The district court, however, did not address the fundamental question whether the officers' conduct, while consistent with the California statutes, was constitutional. Thus, its analysis was incomplete. Henry, as a "person invoking [an as-applied challenge,] asserts that the acts ... that are the subject of the litigation fall outside what a properly drawn prohibition could cover." *Board of Trustees, State Univ. of N.Y. v. Fox,* 492 U.S. 469, 482, 109 S.Ct. 3028, 3036, 106 L.Ed.2d 388 (1989). On this appeal, the issue is not whether the officers' conduct was in accord with state law, but whether their conduct "[fell] outside what a properly drawn [statute] could cover." *Id.* The question of the constitutionality of the provisions of §§ 40302 and 40307 as applied to facts like these is a matter that we have not yet decided.[17] Because the answer depends on questions of fact and law, *see, e.g., Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3149-50, 82 L.Ed.2d 317 (1984), that the district court did not address, we prefer not to decide it initially on appeal. We prefer to leave initial decisions of questions of this type to the district court. We remand these claims to the district court for further consideration. *United States v. One 1978 Piper Cherokee*

15. Even though the officers also told Henry that they intended to put him "in" jail, they did not actually do that; nor was Henry put in jail without intervening "cause." Immediately after Henry's arrival at the jail, the booking agent told Henry that he could either sign a promise to appear and be released on his own recognizance or post bail. It was only after Henry refused to do so and instead renewed his request to see a magistrate that Sergeant Bosenko and Deputy Doyle decided to book him and put him in jail.

16. Section 40302, however, is "a procedure for arrest of a Vehicle Code violator; it does not prohibit conduct, nor is it the basis for arrest." *People v. Monroe,* 12 Cal.App.4th 1174, 1192-93, 16 Cal.Rptr.2d 267, 280 (Cal.Ct.App.1993); *see also People v. Superior Court of Los Angeles County,* 7 Cal.3d 186, 200-201, 101 Cal.Rptr. 837, 496 P.2d 1205, 1216 (Cal.1972) (§ 40302 "is not pe-

nal in nature and cannot form a basis for a lawful arrest"), *abrog. on other grounds, People v. Castaneda,* 35 Cal.App.4th 1222, 1228-29, 42 Cal.Rptr.2d 18, 22 (Cal.Ct.App.1995).

17. We note that in *United States v. Mota,* 982 F.2d 1384 (9th Cir.1993), in which we held that officers violate a suspect's Fourth Amendment rights when they take him into custodial arrest without state-law authority, we expressed no view on the constitutionality of custodial arrests for traffic infractions pursuant to any state law. We cited Cal.Penal Code § 853.5, which permits officers to take into custody individuals arrested for infractions who refuse to sign written notices to appear, only to establish that the officers in that case did not act in accordance with state law. *See id.* at 1388-89. The constitutionality of Penal Code § 853.5 was in no respect before us.

*Aircraft,* 91 F.3d 1204, 1210 (9th Cir.1996); *Dodd v. Hood River County,* 59 F.3d 852, 864 (9th Cir.1995).

## V. Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment with respect to the State of California, but reverse and remand with respect to the County of Shasta, its policymaker Sheriff Pope, and Officers Chaidez and Smith.[18]

AFFIRMED IN PART, REVERSED AND REMANDED IN PART. Costs are awarded to Plaintiff–Appellant.

RYMER, Circuit Judge, dissenting.

The issue in this case is not whether Henry's treatment at the Shasta County Jail was awful: it was awful. The issue is whether the County and Sheriff Pope (or the arresting officers) had anything to do with it. There is no evidence they did. For this reason I part company with the majority opinion.

### I

Liberally construed, Henry contends that the County and Sheriff Pope were responsible for his continuing illegal arrest and incarceration once they accepted him into their custody.[1] It is well settled that the County and the Sheriff in his official capacity can be held liable under § 1983 only if they deprived Henry of a constitutional right as a result of an official policy or custom. *Monell v. Department of Soc. Servs. of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

As I piece it together, Henry posits four unconstitutional policies: a policy not to have magistrates available at night; a policy to delay magistrate appearances overnight; a policy not to assist an arrestee in contacting a magistrate; and a policy to delay magistrate appearances, and to retaliate against detainees who demand to see a magistrate, by incarcerating them in the safety cell and coercing their compliance with booking procedures. While there is some evidence of a policy that magistrates are not available until the next business day following an arrest at night, it was not constitutionally unreasonable for Henry to be detained overnight. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 1669–70, 114 L.Ed.2d 49 (1991). Beyond this, there is no evidence that the County or Pope had adopted a formal policy of delaying appearances or retaliating in any way against those who asked to see a magistrate, and there is no evidence affirmatively linking Henry's treatment by individual jailers to an official County policy or custom, whether effected by "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38; *see also City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").

Absent a formal government policy, Henry must show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity," *Gillette v. Delmore,* 979 F.2d 1342, 1346 (9th Cir.1992) (internal quotations omitted). Henry's only submission consists of declarations from two other persons who were arrested after he was, on July 28, 1993 and in February or March, 1994, and were also kept in a jail safety cell when they refused to comply with booking procedures and demanded to see a magistrate in connection with traffic-related infractions. However, there is no evidence that Shasta County or Pope knew about Henry's treatment at the jail such that it could reasonably be inferred

---

**18.** Because summary judgment was not granted with respect to the unnamed defendants, they, too, remain parties to this case, subject to the rules applicable to unnamed "doe" defendants.

**1.** Actually, Henry's opening brief makes no argument at all about the liability of Shasta and Sheriff Pope. The issue should, therefore, be

deemed abandoned. *See, e.g., Officers for Justice v. Civil Serv. Comm'n,* 979 F.2d 721, 726 (9th Cir.1992). In his reply brief, Henry does argue that the county and the Sheriff have a policy of delaying the taking of arrestees to the magistrate for 14 hours when the charge is an infraction.

from the later incidents that they had somehow ratified what happened to Henry, or that there was "a widespread practice" that was "so permanent and well settled as to constitute a 'custom or usage' with the force of law," *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)), that caused Henry to be treated as he was. Pope's declaration to the contrary is uncontradicted.

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir.1996) (noting that two incidents are not sufficient to establish custom, *Meehan v. County of Los Angeles,* 856 F.2d 102 (9th Cir.1988)), *cert. denied,* — U.S. —, 117 S.Ct. 1249, 137 L.Ed.2d 330 (1997). Nor may a supervising policymaker (which I am willing to assume for this purpose that Pope was, although Henry provides no facts and cites no law indicating that this is so [2]) be held liable without participating in a particular decision or ratifying it, unless "a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 928. Nothing of the sort has been shown here. Therefore, even if individual jailers in these three instances did place the detainees in a safety cell for retaliatory and coercive purposes, violating their First, Fourth, and Fourteenth Amendment rights, neither Shasta County nor Pope can be liable

under § 1983. Otherwise, Shasta County would be liable "*solely* because it employs a tortfeasor-or, in other words ... on a respondeat superior theory." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036 (emphasis original).

None of the cases upon which the majority relies to support its theory of post-event liability has anything to do with this case, where there is *no* evidence that the policymaker (assuming that's what Pope is) or the County knew about the Henry incident, had any custom or policy sanctioning, encouraging or permitting the objectionable treatment about which he complains, or expressed any opinion about it that would raise a triable issue of fact about what official policy was.[3]

In *Larez v. City of Los Angeles,* 946 F.2d 630, 645 (9th Cir.1991), Gates expressed an opinion after the incident (but during the trial) that showed what he thought about the use of force by law enforcement officials; there is no evidence about Pope that is remotely comparable. *McRorie v. Shimoda,* 795 F.2d 780, 784 (9th Cir.1986), came up on dismissal of a pro se complaint—not summary judgment, as here—and the plaintiff had alleged that his injury was inflicted under orders. Here, Henry failed to come up with any evidence that tended to show that what happened to him at the jail was ordered by Pope or the County. In *Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir.1985), there was no dispute that the Chief of Police knew about the incident; indeed, he'd been advised the minute trouble began. There is no similar evidence that Pope (or anyone else outside the jail) knew about the incident (or any past incident of a similar nature), and failed to respond. The question in *Bordanaro v. McLeod,* 871 F.2d 1151 (1st Cir.1989),

**2.** *See Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1368 (9th Cir.1994) (rejecting § 1983 claim where plaintiff cited no facts nor law showing that a police commander is an authorized decisionmaker for the City and County), *cert. denied,* 513 U.S. 1083, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995).

**3.** Indeed, Pope's declaration makes it clear that official policy was to comply with the mandates of the Supreme Court in *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Pope also affirms that he knew of no custom, practice or procedure whereby persons arrested for infractions are denied

their right to be taken before the Magistrate at the earliest opportunity; that it is official policy to comply fully with California law regulating when strip searches of arrestees are permitted, and that he knows of no custom, practice or procedure (or of any instance) whereby jail personnel conduct a strip search of a detainee arrested for an infraction; that there is no custom, practice or procedure whereby an arrestee is denied his right to make calls or isn't offered the opportunity to do so; and that he does not sanction or permit arrestees to be threatened, abused or in any way endangered by jail personnel. These statements are uncontradicted.

was whether the admission of post-event evidence was an abuse of discretion; unlike the record in this case, there was evidence that the Chief had a report review process in place and must therefore have known about the incident. Also different from *Black v. Stephens*, 662 F.2d 181 (3d Cir.1981), there's no issue in this case about instituting adequate investigatory procedures. And in *Jones v. City of Chicago*, 787 F.2d 200 (7th Cir.1986), the City obviously knew about the prior complaint as it had investigated it, whereas there is no evidence at all that Pope or Shasta knew about the *Henry* complaint. That makes all the difference in my view, for in the absence of any evidence that Pope or Shasta knew (or should have known because of procedures in place) about Henry's experience at the jail, either before it happened (because it was a practice they knew about) or while it was happening (because someone told them) or after it happened (because they knew about the complaint but did nothing to change things at the jail), it is not reasonable to infer backwards from the fact that a similar incident allegedly happened months later that either Pope or Shasta had a custom or policy that caused, or condoned, or was connected in any way with, Henry's injury.

I have no quarrel with the proposition that *some* post-event evidence *may be* admissible on the custom and policy of a police department to show ratification or condemnation of the acts of others, but post-event evidence has *no* probative value on the *prior* existence of a custom or policy that caused constitutional injury to Henry in the absence of some *other* evidence showing that the policymaker was somehow aware of the incident yet did nothing to end it—or said something to embrace it. It is only the fact of inaction (or affirmation) in the face of knowledge that gives rise to an inference that the policy that was left in place was in place all along.

Here, there is absolutely nothing to show that Pope or Shasta knew about the incident, or Henry's suit, before the Burns incident in February or March of 1994.[4] I would, therefore, affirm judgment for Pope and Shasta County.

## II

I agree with the majority that the officers' conduct was objectively valid under California law, and that the district court incorrectly stopped its analysis once it concluded that Henry was taken into custody and transported to the Shasta County Jail pursuant to state law. Henry's challenge to the constitutionality of the statutes as applied requires the court to consider whether, in addition to the propriety of their conduct under state law, Chaidez and Smith violated his federal constitutional rights. However, I disagree that we need to remand on this account.

Chaidez and Smith did not violate any constitutional right with respect to the arrest and decision to take Henry into custody, because he undisputably did commit infractions, asked to be taken to a magistrate, and did not otherwise promise to appear. This leaves the question whether Henry's request to be taken before a magistrate and his refusal to sign the Notice to Appear justified the *extent* of detention based solely on Chaidez's assessment of probable cause. (As there is no evidence that the CHP officers had anything to do with Henry's treatment at the jail, except driving him to and from the hospital, or that they had any knowledge about how he would be handled, or responsibility for the decisions made at the jail by employees of the Shasta County Sheriff's Department, their liability in this case cannot depend on the constitutionality of the *nature* of Henry's detention.) Under the Supreme

---

4. Pope *may* have known about the suit, but there's no *evidence* that he did know about it before the Burns incident. Henry was arrested May 19, 1993; the May incident occurred July 28, 1993 (and there's no evidence Pope knew about it, either); Henry's complaint in this action was filed December 30, 1993; Shasta and Pope filed an answer March 3, 1994; and the Burns incident was "February or March of 1994." Nor is there evidence to show what response, if any, Pope made to Henry's complaint after it was served, or even that there was time to do anything to avert a similar (Burns) incident from happening between the time of service and following investigation. Far from leading to a reasonable inference of ratification, it is patently unreasonable to conjure a triable issue of fact on this record.

Court's opinion in *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), and ours in *Hallstrom v. City of Garden City*, 991 F.2d 1473 (9th Cir.1993), detention at a jail facility from 9:55 p.m. until a magistrate was available at 1:30 p.m. the following day was not unreasonable.

Arresting officers have a constitutional duty to ensure that arrestees are taken before a judicial officer "promptly after arrest." *Gerstein v. Pugh*, 420 U.S. 103, 125, 95 S.Ct. 854, 869, 43 L.Ed.2d 54 (1975). *McLaughlin*, in turn, indicates that a judicial determination of probable cause within forty-eight hours of arrest will generally comply with *Gerstein*. *McLaughlin*, 500 U.S. at 56, 111 S.Ct. at 1669–70; *Hallstrom*, 991 F.2d at 1480. When a hearing does take place within a forty-eight hour period (as it did in Henry's case), the person arrested has the burden of proving that his probable cause determination was delayed unreasonably. As the Court explained in *McLaughlin*:

> Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

500 U.S. at 56–57, 111 S.Ct. at 1670. Henry adduced no evidence of unreasonable delay by Chaidez and Smith apart from the fact that he was not taken to a judicial officer until 1:30 in the afternoon following his 9:55 p.m. arrest. However, this is not prolonged detention beyond the mandate of *McLaughlin*, and is not unreasonable given the late-night arrest. Henry had his chance to overcome summary judgment on the point, but

didn't. Therefore, I would affirm as to Chaidez and Smith.