**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLA CONN; DUSTIN CONN,
*Plaintiffs-Appellants,*

v.

CITY OF RENO; RYAN ASHTON;
DAVID ROBERTSON,
*Defendants-Appellees.*

No. 07-15572

D.C. No.
Cv-05-00595-HDM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Howard D. McKibben, District Judge, Presiding

Argued and Submitted
October 20, 2008—San Francisco, California

Filed July 24, 2009
Amended January 8, 2010

Before: Mary M. Schroeder, Dorothy W. Nelson and
Stephen Reinhardt, Circuit Judges.

Order;
Dissent to Order by Chief Judge Kozinski'
Opinion by Judge Reinhardt

633

## COUNSEL

Terri Keyser-Cooper, Reno, Nevada, and Diane K. Vaillancourt, Santa Cruz, California, for the plaintiffs-appellants.

John J. Kadlic, Reno City Attorney, Donald L. Christensen, Deputy City Attorney, Reno, Nevada, for the defendants-appellees.

## ORDER

The majority opinion filed July 24, 2009, slip op. 9581, and appearing at 572 F.3d 1047 (9th Cir. 2009), is hereby amended as follows:

> 1. Slip op. at 9611, line 7: replace <No such policy had been adopted and implemented as of April 26, 2005.> with <This is further evidence that as of April 26, 2006 no such policy had been adopted and implemented.>

> 2. Slip op. at 9611, line 8: after <This is further evidence that as of April 26, 2006 no such policy had been adopted and implemented.>, insert the following footnote: <The evidence of the new policy is admissible solely as evidence of the absence of an earlier policy and not for the purpose of proving negligence or culpable conduct of any kind. See Fed. R. Evid. 407.>

The panel has voted to deny the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. FED. R. APP. P. 35.

The petition for rehearing en banc is denied. No further petitions for rehearing may be filed.

Chief Judge KOZINSKI, with whom Judges O'SCANNLAIN, KLEINFELD, TALLMAN, CALLAHAN, BEA and IKUTA join, dissenting from the denial of rehearing en banc.

Until this opinion came along, police officers weren't required to serve as babysitters, psychiatrists or social workers, and judges didn't run suicide-prevention programs. Responsibility for preventing suicide rested with the individual and the family, not the state. But the panel has discovered that the Constitution demands a change in job description: Judges will henceforth micromanage the police, who in turn will serve as mental health professionals. The panel's reasoning has no stopping point, and our decision to let it stand threatens unprecedented judicial intervention in our local institutions.

At bottom, this case raises the question of whether the state has a legal (as opposed to moral) obligation to provide for the health of its citizens. We have repeatedly rejected the idea that such an obligation exists. *See, e.g.*, *DeShaney* v. *Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 200 (1989). This is in part because the benevolent welfare state is in tension with our tradition of liberty and individual dignity: What the state provides for you, you do not provide for yourself, and as the sphere of public largesse grows, the realm of private initiative retreats. It also reflects a judgment that any redefinition of the role of the state should occur under the supervision of democratically elected officials, not unaccountable federal judges. States may obligate themselves, but they should not have novel duties thrust upon them by judicial fiat.

We have recognized an exception to this rule when the state places a person in jail, but that exception has been strictly limited by its rationale. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation it has imposed on his freedom to act on his own

behalf." *DeShaney*, 489 U.S. at 200. A prisoner cannot feed or clothe himself, and he cannot get himself to a doctor; it is therefore incumbent on his keeper to do those things for him. *See, e.g.*, *id.*; *Estelle* v. *Gamble*, 429 U.S. 97, 103 (1976). And, because the state creates the prisoner's conditions of incarceration, the state has a duty not to purposefully create a risk of harm—for instance, by placing the prisoner in a cell with a person who intends to do him ill. *See, e.g.*, *Farmer* v. *Brennan*, 511 U.S. 825, 832-33 (1994). Apart from that rationale, there is no free-floating obligation to safeguard prisoners' health. Otherwise, the distinction between prisoners and non-prisoners would become illusory, and we would be forced to recognize a duty of care towards society as a whole.

The panel's opinion is significant because it cuts the state's obligation loose from this tether and creates novel duties to train and to report information that bear no relationship to the fact of incarceration. In the process, it strips the guts out of the deliberate indifference standard, as well as the requirement that plaintiffs show a violation of clearly established law to defeat qualified immunity. In the panel's hands, standards that are meant to limit liability to all but the most extreme cases become tools for imposing the policy preferences of unelected federal judges. This combination of errors amounts to a toxic recipe for judicial micromanagement of local institutions.

**1.** In a brief portion of the opinion that will nevertheless have far-reaching consequences, the panel finds the City of Reno potentially liable for failure "to train its officers in suicide prevention and the identification of suicide risks." *Conn* v. *City of Reno*, 572 F.3d 1047, 1063 (9th Cir. 2009). To avoid liability under our federal Constitution, police departments throughout the Ninth Circuit must now transform their police officers into suicide prevention experts. This novel holding creates a clear inter-circuit split and is irreconcilable with the standard for liability fashioned by the Supreme Court in *City of Canton* v. *Harris*, 489 U.S. 378 (1989).

When ordinary citizens go about their business, they are not monitored by experts in suicide prevention. If you or I waltz up to a government employee— perhaps a mail man, dog catcher or meter maid—and announce, "today's a good day to kill myself," the Constitution does not guarantee that our chosen confidant will be a Sigmund Freud or Jacques Lacan. If we want to see a psychiatrist, we have to go see a psychiatrist. We certainly don't have a right to expect that every public servant we encounter will be specially trained to cater to our mental health needs.

According to the panel, citizens who are arrested fall into a different and more rarified class. When Brenda Clustka announced her suicidal thoughts to the officers sent to arrest her, she had the right to an audience trained in "suicide prevention and the identification of suicide risks." *Conn*, 572 F.3d at 1063. Indeed, the failure to provide that audience was "the functional equivalent of a decision by the city itself to violate the Constitution." *Harris*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). But why? What constitutional penumbra turns the bench of a paddy wagon into a psychoanalyst's couch?

Plaintiffs are not the first litigants to seek to impose such a novel and dangerous duty, but other courts have steadfastly rejected similar claims. *Manarite* v. *City of Springfield*, 957 F.2d 953, 959 (1st Cir. 1992) (rejecting claim that city was liable for failing to provide "training and education . . . in suicide detection and prevention"); *Colburn* v. *Upper Darby Twp.*, 946 F.2d 1017, 1029-30 (3d Cir. 1991) (rejecting claim that jail was liable because it "failed completely to formally train its staff in signs and symptoms of suicide," including "instruction to take all suicide threats seriously") (emphasis omitted); *Popham* v. *City of Talladega*, 908 F.2d 1561, 1564-65 (11th Cir. 1990) (no liability for "failure to train jail personnel to screen detainees for suicidal tendencies"); *Burns* v. *City of Galveston*, 905 F.2d 100, 104 (5th Cir. 1990) (no liability for "[f]ailure to train police officers in screening pro-

cedures geared toward detection of detainees with suicidal tendencies"); *see also Harris*, 489 U.S. at 396-97 (O'Connor, J., concurring in part and dissenting in part) ("The claim in this case—that police officers were inadequately trained in diagnosing the symptoms of emotional illness—falls far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference . . . .").

What Clustka surely did have was a right of access to medical treatment; because Clustka could not take herself to the doctor, the city had an obligation to make psychiatric care available to her. *See Estelle*, 429 U.S. at 103. The city more than fulfilled that obligation. Right before her arrest, Clustka was evaluated by a team of medics. At intake, she was examined by a nurse who received annual training in suicide prevention. She was then held in a detoxification cell that was regularly monitored by jail staff and nurses. After discharge, she was arrested a second time and brought by police to an emergency room, where she was seen by a physician. And when she was arrested a third time, she was booked into the mental health unit of the jail, which is managed by a licensed social worker and staffed around the clock. When Clustka committed suicide, she was scheduled to meet with a psychiatric nurse later that day. And there is no reason to think that Clustka would have been denied additional care if she had requested it.

Other circuits have rejected claims that the Constitution requires the kind of routine intake screening that was provided by the City of Reno. *See Colburn*, 946 F.2d at 1029-30; *Popham*, 908 F.2d at 1564; *Burns*, 905 F.2d at 104. Rightly so: Such screening may be laudable, but it also provides a benefit that prisoners could not reasonably expect to receive if they had not been arrested. The measures taken by the city therefore went far beyond anything the Constitution could conceivably require.

Against the backdrop of the city's efforts, the panel's holding that the city could be found deliberately indifferent is

remarkable. "[F]ar from demonstrating deliberate indifference to the mental health needs of . . . potentially suicidal detainees, . . . the policies implemented by the City [of Reno] demonstrate an effort to ensure the safety of persons like decedent." *Manarite*, 957 F.2d at 960; *see also Liebe* v. *Norton*, 157 F.3d 574, 579 (8th Cir. 1998) ("[T]he County's policy cannot be both an effort to prevent suicides and, at the same time, deliberately indifferent to suicides."). The panel isn't just saying that the city has to be aware of and take steps to address the problem of suicide. The city plainly did that, and more. The panel is saying that the act of employing professionals to examine and care for inmates' mental health won't suffice; the city has a duty to enlist police officers as trained suicide-prevention experts. And, more broadly, the city is obliged to run its suicide prevention program in whatever manner unelected federal judges think best.

This is precisely the kind of micromanagement of local law enforcement that the Supreme Court has instructed us to avoid. *See Harris*, 489 U.S. at 392. The Court in *Harris* was clear that deliberate indifference means more than negligence, and that a high bar to liability is necessary to forestall "an endless exercise of second-guessing municipal employee-training programs"—both because federal judges are "ill-suited" to such a role and because excessive judicial intervention would "implicate serious questions of federalism." *Id.*

As an example of conduct that might satisfy the deliberate indifference standard, the Court therefore pointed to a total abdication of constitutional responsibility: A city that armed its police but failed to train them in the use of deadly force. *Id.* at 390 n.10. This is hardly that kind of case. The city didn't fail to address the problem of inmate suicide; it failed to address the problem in the way my colleagues think best. If that is enough to give rise to liability, I can't imagine what local institution is safe from judicial meddling, or what if anything is left of our tradition of local self-government.

**2.** In another troubling portion of the opinion, the panel holds that clearly established law required the officers transporting Clustka to report any suicide threats made en route to jail. *Conn*, 572 F.3d at 1062. On that basis, the panel withholds qualified immunity. *Id.*

To see why the panel's holding is remarkable, consider the context in which these defendants acted. The officers did not take Clustka to the hospital after the events in question, but they did take her to a prison where they knew she would be seen upon arrival by a nurse trained in detecting and preventing suicide risks. They did not tell the nurse what Clustka said after being arrested, and the care that Clustka received may have been less effective as a result. But the officers did not withhold psychiatric care or actively interfere with Clustka's treatment. Their alleged fault was in failing to pass on information that would be relevant to routine psychiatric screening that the city should not be required to provide in the first place. The panel's denial of qualified immunity in these circumstances means that officers can no longer leave the treatment of medical issues to trained medical professionals. Instead, they must actively assist those professionals by providing any information potentially relevant to a diagnosis. I doubt such a duty exists, and I certainly don't think it exists under clearly established law.

Once again, if ordinary citizens threaten suicide in front of a government employee—be it a tax collector, tollbooth operator or member of the judiciary— they have no constitutional right to have those statements communicated to their families or their doctors. Our Constitution does not turn government officials into the eyes and ears of the American Medical Association. So why should it be any different for citizens lucky enough to go to jail? It's true that prisoners can't take themselves to the doctor, *Estelle*, 429 U.S. at 103, but the officers here took Clustka to a place where she was seen by a medical professional trained in suicide prevention. After the officers put Clustka in the same (or better) position than she occupied

before she was arrested, what in our federal Constitution required anything more? I can't imagine any answer that would not apply with equal force to those of us not in jail.

Our prior cases have rightly declined to acknowledge such a duty to assist. In *Wood* v. *Housewright*, we rejected a prisoner's claim that prison officials violated his constitutional rights by failing to provide his medical records to medical professionals. 900 F.2d 1332, 1334 (9th Cir. 1990). Judge Reinhardt argued in dissent that failure to provide information constitutes deliberate indifference because "treatment can . . . best be prescribed if records are available for review," *id.* at 1343 (Reinhardt, J., dissenting in part), just as he reasons today that, although Clustka received medical care, her diagnosis "was never made by someone who had all the requisite information about her psychological instability," *Conn*, 572 F.3d at 1060 (emphasis omitted). In *Wood*, a majority of the panel disagreed. *See* 900 F.2d at 1334 (Farris, J.); *id.* at 1336 (Hug, J., concurring). "Although Wood's treatment was not as prompt or efficient as a free citizen might hope to receive, Wood was given medical care at the prison that addressed his needs." *Id.* at 1334 (Farris, J.); *see also Ruvalcaba* v. *City of Los Angeles*, 167 F.3d 514, 525 (9th Cir. 1999) (prison doctor's failure to take patient's medical history, although negligent, did not support finding of deliberate indifference). That was correct then, and it remains correct today.

Despite this contrary precedent from our own court, the panel reverses the district court's grant of qualified immunity. *Conn*, 572 F.3d at 1062. Of course, the cases the panel cites to show a violation of clearly established law demonstrate nothing of the kind. The only Ninth Circuit case, *Cabrales* v. *County of Los Angeles*, involved a claim for "medical understaffing at the jail," such that "psychiatric staff could only spend minutes per month with disturbed inmates." 864 F.2d 1454, 1461 (9th Cir. 1988). And in *Colburn*, although a suicidal inmate was held in prison without any medical attention whatsoever (including no medical screening at intake), the

Third Circuit found the officers *not* liable for their failure to provide access to medical care. 946 F.2d at 1025. Both cases are miles away from this one, and *Colburn* supports the defendants rather than the plaintiffs.

The closest case is *Cavalieri* v. *Shepard*, 321 F.3d 616 (7th Cir. 2003), but it doesn't support the panel's conclusion either. In that case, a police officer assured an arrestee's mother that her son would not be left alone while in jail but failed to pass that information on to the son's custodians. *Id.* at 622. The Seventh Circuit emphasized that the mother might "have gone directly to the [jail] if she had known that [the officer] did not intend to inform anyone of their conversation." *Id.* By contrast, Clustka's family never asked these individual defendants for help, and they never promised to give it. The only obligation they incurred when they took Clustka into custody was to ensure that incarceration did not deprive her of the care that she otherwise could have obtained for herself. *See DeShaney*, 489 U.S. at 200. The officers fulfilled that obligation.

Cities and police should be entitled to assign responsibility for the treatment of mental illness to trained medical professionals; certainly, the Constitution should not forbid such a division of responsibility. But the panel holds to the contrary: From here on out, police must become active participants in the treatment of mental illness. And, unable to rely on the shield of qualified immunity, police will wait with trepidation to see what other novel duties courts shift onto their shoulders. This will exact a cost: As police devote time and energy to judicially-imposed obligations, they will have less time and attention to devote to preventing crime, protecting their own safety and avoiding other types of constitutional violations. These are precisely the kinds of trade-offs that should be evaluated by elected officials, and not by federal judges who lack expertise and local knowledge and who do not represent the people directly affected by such decisions.

**3.** In yet another alarming portion of the opinion, the panel holds that a jury could find that the officers' failure to relay information on April 26 was the actual and proximate cause of Clustka's suicide on April 28. *Conn*, 572 F.3d at 1058-62. The panel's lax approach to causation dismantles yet another barrier to judicial intervention in local affairs.

With respect to "actual" cause, we simply don't know what would have happened had the officers reported Clustka's statements to the jail. The prison's health services administrator testified that the intake nurse would have considered the statements along with "a variety of variables" when assessing Clustka's mental health needs. We therefore can't know whether Clustka would have received additional care, or whether that care would have been effective. The best the panel can say is that "Clustka's suicide *might* well have been prevented" by "intervention [that] would *likely* have occurred." *Id.* at 1060 (emphasis added). This falls far short of showing that, "but for" the officers' omission, Clustka would not have committed suicide. *White* v. *Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990).

As for proximate cause, any conceivable connection between the officers' omission and Clustka's suicide is far too attenuated to support liability. Two full days passed between Clustka's statements and her suicide. In the interim, Clustka was "served with a Temporary Protective Order ('TPO'), which her mother had earlier sought" and which "ordered Clustka to stay away from her mother's residence." *Conn*, 572 F.3d at 1053. Clustka was also arrested twice, at least once because her own mother called police, rather than a doctor, "to report that Clustka was causing a disturbance." *Id.* And her mother wasn't the only one who passed up a chance to keep Clustka from taking her life. Clustka was taken to the hospital, where she was examined by a physician and then released. And she was seen by two intake nurses trained in suicide prevention.

The requirement of causation—like the deliberate indifference standard and the doctrine of qualified immunity—limits the ability of judges to micromanage local institutions. *See Harris*, 489 U.S. at 391-92. So long as they are limited to errors that actually caused plaintiffs' injuries, judges sit to decide concrete cases and do not superintend entire programs and institutions. But, if judges can draw attenuated causal connections of the sort at issue in this case, they can expand their authority to encompass a much larger sphere of activity. Any mistake by local officials, no matter how remote its consequences, will become a federal case, and no corner of local activity will remain beyond judicial authority. The Butterfly Effect becomes an engine for judicial intervention. This may appeal to federal judges, who undoubtedly believe they know how to run local law enforcement far better than police and local officials, but it should make everyone else very uncomfortable.

\* \* \*

Untethered from the need to explain why the state should owe any affirmative obligations to its citizens, and unconstrained by qualified immunity, causation and the deliberate indifference standard, judges will henceforth be free to intrude on the most minute aspects of local decisionmaking. The Constitution will have become a " 'federal good government act' for municipalities," *Harris*, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part), and little will be left of our tradition of local self-government. Second-guessing suicide-prevention measures designed by local officials, and turning police into psychiatrists' assistants, will be just the beginning of this brave new world of rule by judiciary. This is a sweeping and dangerous precedent, and we severely undermine the autonomy of local governments by failing to correct the error through our en banc process.

## **OPINION**

REINHARDT, Circuit Judge:

This story has no happy ending, and it was unhappy long before the events in question transpired. For years before she ultimately committed suicide in the Washoe County Jail, Brenda Clustka ("Clustka") struggled with alcohol abuse and serious mental health problems, including suicidal ideation. The longevity of her struggle and the persistence of her problems, however, do not absolve the defendants if they were deliberately indifferent to her serious medical need and as a result played a causal role in her death.

While transporting Clustka to civil protective custody, two Reno police officers witnessed her wrap a seatbelt around her neck in an apparent attempt to choke herself and then scream that they should kill her or else she would kill herself. The officers failed to report the incident to jail personnel or take her to a hospital. Clustka was released from protective custody a few hours later. The next day, she was again detained on a misdemeanor charge. During this second detention, less than 48 hours after the suicide threats, Clustka hanged herself in her cell.

When an individual is taken into custody and thereby deprived of her liberty, the officials who hold her against her will are constitutionally obligated to respond if a serious medical need should arise. If, with deliberate indifference, these officials fail to respond appropriately and instead act in a manner that will foreseeably result in harm, they violate her due process rights. The same is true when a municipality, with deliberate indifference, fails to train its law enforcement officers or fails to adopt and implement policies when it is highly predictable that such inaction will result in constitutional violations.

We hold that, on the facts presented, a reasonable jury could find that the defendant police officers are liable under

42 U.S.C. § 1983 for their deliberate indifference to Clustka's serious medical need, and that their actions were a cause in fact and a proximate cause of her suicide. Likewise, a jury could find the City of Reno liable for its failure to train its law enforcement officers or to implement policies on suicide prevention and reporting. For these reasons, and as explained further below, we reverse the district court's grant of summary judgment in favor of the defendants and allow Clustka's surviving children to bring their claims before a jury.

## I.   BACKGROUND

### A.

Petitioners Charla and Dustin Conn ("the Conns") are the surviving children of Brenda Clustka, who committed suicide on April 28, 2005 while in custody and awaiting trial at the Washoe County Jail.

Clustka had long struggled with mental health problems and suicidal ideation. She also had a history of repeated encounters with the law: she had multiple misdemeanor convictions, including for domestic violence, larceny, and driving under the influence. Between 2001 and 2004, Clustka was involuntarily committed to the Nevada Mental Health Institute ("NMHI") on three separate occasions under a Legal 2000[1] for threatening or attempting suicide. Her mental health further deteriorated in 2005.

On March 19, 2005, Clustka was arrested for domestic battery of her mother. Officer Ashton ("Ashton"), one of the defendants in this case, was present during the arrest. Once in custody, Clustka stated that she "[wouldn't] make it in jail"

---

[1]A Legal 2000 is a procedure under Nevada law whereby people suffering from mental illness or who may be a danger to themselves or others may be involuntarily committed to a mental health facility for up to 72 hours.

and was placed on prison suicide watch. She was detained for just over one month and released on April 21, 2005.

A few days later, on April 25, 2005, Clustka relapsed into suicidal ideation. She was taken to Washoe Medical Center where she threatened to commit suicide in the emergency room by overdosing on her medication. Clustka was evaluated as suffering from "acute suicidal ideation" and transferred to NMHI on a Legal 2000. Her NMHI intake assessment states that she was at "serious risk of harm." At 9:06 a.m. the next morning, however, Clustka was medically evaluated and released. According to the evaluating doctor, Clustka denied that she had any suicidal thoughts; she said she was "feeling 'tired' but otherwise well" and was assessed to be only at a "low risk of harm" at the time of discharge.

Several hours later on April 26, 2005, at 2:43 p.m., Ashton and his co-defendant, Officer Robertson ("Robertson"), were dispatched in response to a 911 call, which reported that someone, who turned out to be Clustka, was passed out on the sidewalk. The officers found Clustka in a "grossly intoxicated" state; she "had a difficult time walking without assistance." Ashton, who had been one of the arresting officers handling the domestic battery call a month earlier, recognized Clustka on sight. The officers decided to take Clustka to Washoe County Jail on Civil Protective Custody ("CPC") for her own safety until she sobered up. They ran a "wants and warrants check" and were cautioned of Clustka's "violent tendencies, [that she was] known to abuse drugs, [was an] alcoholic [and had] other mental health problems." Ashton admitted that he was aware of Clustka's violent tendencies and mental health problems; nevertheless, the defendants chose not to handcuff her because she was being detained for her own protection, not on a criminal charge.

Clustka did not want to be taken to jail; she became agitated and uncooperative when told where she was going. Robertson then told Clustka, falsely, that they would take her,

instead, to her residence. Robertson testified that he lied because Clustka was belligerent, and because he wanted to cajole her into the paddy wagon cooperatively, which he succeeded in doing.

En route to the jail, with her hands free, Clustka removed her seatbelt. She began walking around the back of the paddy wagon and tapping on the video surveillance camera to get the officers' attention. According to Ashton, he asked Robertson if they should pull over to secure Clustka in her seat, but Robertson decided against it, as they were near the jail and he wanted to avoid any further confrontation. Both officers believed that there was a Reno Police Department policy and a state law requiring the wearing of seatbelts.

As they neared the jail, Clustka realized where she was being taken and became angry, belligerent, and uncooperative. As Ashton observed her through the surveillance camera, Clustka returned to her seat and wrapped the seatbelt around her neck, in an apparent attempt to choke herself. The officers pulled over, unwrapped the seatbelt from her neck, and handcuffed her. Clustka was screaming as they did so. She yelled something to the effect of, "You lied to me. Just kill me. I'll kill myself then."

Both Ashton and Robertson testified that they interpreted Clustka's words and actions as a mere attempt to get their attention and "to manipulate the situation," and that they did not believe Clustka's threats to be serious. However, Ashton admitted that he did not believe that wrapping the seatbelt around her neck was a "joke." Ashton, who had been on the police force for only seven months, remembered asking Robertson, a nearly eighteen-year veteran, whether he should write up a report on the incident, but that Robertson said no. Robertson testified that he "told [Ashton] if he wanted to report it, he could report it." Ashton testified that he was unaware of any written policy mandating the reporting of such incidents.

When they arrived with Clustka at the jail, neither defendant notified jail personnel that Clustka had tried to choke herself or that she had threatened to commit suicide. Instead, Ashton told jail personnel that Clustka was disoriented. The defendants did not write a report nor inform their supervising sergeant about the incident that day. Both asserted that it did not occur to them to report it.

Upon arrival at the jail, Clustka underwent a brief intake assessment, was held in CPC at the Washoe County Jail for nearly four hours, and was released without further inquiry around 8:00 p.m. Upon her release, she was served with a Temporary Protective Order ("TPO"), which her mother had earlier sought and obtained on account of domestic battery. The TPO ordered Clustka to stay away from her mother's residence, where she had been living, and to retrieve her personal belongings only in the company of police officers. There is no indication whether any other place was available where Clustka would be able to sleep.

That evening, notwithstanding the TPO, Clustka returned to her mother's house, and her mother called 911 to report that Clustka was causing a disturbance. Clustka, again grossly intoxicated, was taken to the emergency room, readmitted for observation, and released around 3:00 a.m.

The next day, on April 27, 2005, Clustka again returned to her mother's residence to collect her belongings and was arrested by two officers (not defendants) for violating the restraining order. She was returned to Washoe County Jail.

After Clustka was booked, she was medically screened by the nurse on duty and recommended for assignment to the general inmate population. Because Clustka had been on suicide watch during her previous detention in March, she was placed in the mental health unit in a red jumper to alert staff that she was a high risk detainee. She was not, however,

placed on suicide watch at this time. As a result there was a bed sheet available in her cell.

The following morning, on April 28, 2005, Clustka was escorted to and from her video arraignment. On the way back from the arraignment, at 8:35 a.m., she became upset and started crying because she wanted to make a phone call. At 9:17 a.m., she did not respond to the roll call. A deputy went to check on her and immediately called a Code 50.[2] Clustka had committed suicide by hanging herself with the bed sheet.

The morning of Clustka's suicide, Ashton happened to be present at the Washoe County Jail on an unrelated matter. He recognized Clustka's photograph and told a prison deputy that "she tried to choke herself out in the back of the wagon on Tuesday." Ashton explained to another deputy that a few days earlier, he had transported Clustka to CPC — without handcuffs — and that "she tried to hang herself in the wagon." He stated that his more senior partner had declined to document the incident. Ashton said that he would now write up a report and predicted that his "sergeant will be pissed."

## B.

From January 2004 through August 2005, six detainees in Washoe County Jail committed suicide. Clustka's suicide followed less than 30 days after that of another detainee.

On May 11, 2005, less than one month after Clustka's suicide, the Reno Police Department, apparently for the first time, presented a class on "handling the mentally ill" to better explain the Legal 2000 procedures. In May 2005, a new suicide prevention policy was implemented. At intake, the arresting officer must now answer a series of questions concerning the detainee's mental health, including questions about sui-

---

[2]Code 50 is a jail response when an inmate attempts suicide. Officers and medical personnel rush to the scene.

cide risk. This policy was not adopted until after Clustka's death.

## C.

After Clustka committed suicide, her surviving children, the Conns, filed suit in the District of Nevada under 42 U.S.C. § 1983. They sued Officers Robertson and Ashton for deliberate indifference to Clustka's serious medical need — her suicide risk — which, they alleged, resulted in her death. They also sued the City of Reno under § 1983 for, *inter alia*, its failure to train its law enforcement officers and to implement policies on suicide prevention and reporting. The district court found that the Conns had presented insufficient evidence to raise a genuine issue of material fact as to whether the officers were deliberately indifferent to a serious medical need by failing to report the choking incident and suicide threat and whether such failure to report was the proximate cause of Clustka's death. Consequently, the district court concluded that there was no basis on which a jury could find either individual liability or municipal liability and granted the defendants' motion for summary judgment. The Conns appeal, and we reverse.

## II.   STANDARD OF REVIEW

We review a grant of summary judgment by the district court de novo. *McDonald v. Sun Oil Co.*, 548 F.3d 774, 778 (9th Cir. 2008). We examine all evidence in the light most favorable to the non-moving party, *id.*; Fed. R. Civ. P. 56, and "do[ ] not weigh the evidence or determine the truth of the matter, but only determine [ ] whether there is a genuine issue for trial," *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc). "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If such is the case, "summary judgment will not lie." *Anderson*, 477 U.S. at 248.

## III.   DISCUSSION

### A.   Individual Liability

[1] The Eighth Amendment protects inmates from cruel and unusual punishment, which includes the denial of medical care. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Pretrial detainees, by contrast, are protected under the Due Process Clause of the Fourteenth Amendment. *Or. Advocacy Ctr v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003). Although courts have borrowed from Eighth Amendment jurisprudence in giving shape to pretrial detainees' substantive due process rights, *see Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998), that amendment establishes only "a *minimum standard of care*," *Mink*, 322 F.3d at 1120 (emphasis in original).[3]

[2] The Eighth and Fourteenth Amendments both guarantee that inmates and detainees receive constitutionally adequate medical and mental health care. *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir 1994). An official's deliberate indifference to a substantial risk of serious harm to an inmate — including the deprivation of a serious medical need — violates the Eighth Amendment, and a fortiori, the Fourteenth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Frost*, 152 F.3d at 1128. To set forth a constitutional claim under the Eighth Amendment predicated upon the failure to provide medical treatment,

---

[3]Because here, the Conns prevail under the Eighth Amendment deliberate indifference standard, we need not further explicate in this case the more lenient but more amorphous test under the Fourteenth Amendment that has been suggested by our case law. *See, e.g.*, *City of Revere v. Mass. Gen. Hospital*, 463 U.S. 239, 244 (1983); *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 n.9 (9th Cir. 2002); *Mink*, 322 F.3d at 1120, 1121 n.11; *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004).

[f]irst, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir 2006) (internal citations omitted). The second prong requires both "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* Deliberate indifference thus requires an objective risk of harm *and* a subjective awareness of that harm. *Farmer*, 511 U.S. at 837. We address these requirements — serious medical need, indifference to that need, and harm caused by that indifference — each in turn.

### 1. "Serious medical need"

**[3]** We recognize that a prisoner has a "serious" medical need if the failure to treat the condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Doty*, 37 F.3d at 546 (citing *McGuckin*, 974 F.2d at 1059). A heightened suicide risk or an attempted suicide is a serious medical need. *See id.* (citing *Torraco v. Maloney*, 923 F.2d 231, 235 & n.4 (1st Cir. 1991)); *see also Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) ("A 'particular vulnerability to suicide' represents a 'serious medical need.' ").

The district court did not decide whether summary judgment would be appropriate on the issue of serious medical need, although it commented that the evidence suggested that "Clustka's medical needs . . . were not objectively serious enough to find a 14th Amendment violation." We disagree. The Conns presented sufficient evidence of their mother's

objective, serious medical need for a reasonable jury to find in their favor.

[4] First, the significance of Clustka's medical evaluations around the time of the choking incident and suicide threat is disputed and presents a question for the jury. It is true that Clustka underwent several medical evaluations in the days before and after she tried to choke herself in the paddy wagon, and that only one of these evaluations found her to be at serious risk of harm. The defendants argue that, for this reason, the evaluations establish that Clustka did not present a serious health risk. Their interpretation, however, is not conclusive; rather, the conflict in the evaluations in itself raises a genuine issue of fact for the jury to resolve. Moreover, due to the police officers' failure to report the choking incident and suicide threat, Clustka's evaluators were unaware of those events when they assessed Clustka's mental health, and their conclusions were drawn in the absence of significant information that would have supported the Conns' position.

[5] Second, Clustka's long and undisputed history of mental health problems, alcohol and substance abuse, and suicide threats and attempts — including suicidal ideation the day before the incident in the paddy wagon — supports the conclusion that the threat to Clustka's health was objectively serious, and that if untreated, she was likely to suffer further significant injury.

[6] Third, the choking incident, accompanied by Clustka's threat to kill herself, constituted adequate objective evidence of a serious medical need. Although Ashton conceded that Clustka was not joking when she wrapped the seatbelt around her neck, the defendants attempt to minimize the seriousness of Clustka's situation by characterizing her threats as "manipulative" — as an attempt to catch the officers' attention and to avoid going to jail. The members of the jury, however, are entrusted with the responsibility to weigh the officers' interpretation of the events against other reasonable inferences

more favorable to the plaintiffs. The events may appear differently to the jury than they purportedly did, in hindsight, to Ashton and Robertson. To the jury, that Clustka attempted to choke herself with a seatbelt and screamed at the defendants that they should kill her or she would kill herself may, by itself, be sufficient to establish her serious medical need. This is particularly so since the Conns presented evidence that suicide threats by detainees must *always* be taken seriously.

The defendants contend that, even if Clustka truly intended to harm herself, there was no genuine possibility that she would have succeeded in killing herself in the paddy wagon. The defendants argue, rather callously, that the seatbelt would have slackened if and when she passed out, and that Clustka was therefore at no real risk of dying. This, of course, is beside the point. Whether Clustka's life was in danger en route to the jail does not affect the more important question whether Clustka was at a heightened risk of killing herself in the near future, as she ultimately did — a heightened risk that itself presents a serious medical need. It is not necessary, moreover, that a serious medical need imminently result in death — an attempted suicide is sufficient. *See Doty*, 37 F.3d at 546 (citing *Torraco*, 923 F.2d at 235 & n.4).

**[7]** An objective juror could certainly conclude that in light of all the circumstances Clustka's actions evidenced a serious medical need. The defendants' attempts to cast doubt on the gravity of Clustka's words and actions merely create a fact question for the jury to resolve. We conclude, therefore, that the Conns have raised a genuine issue of material fact as to the question of serious medical need.

### 2. "[D]efendant's response to the need was deliberately indifferent"

To demonstrate the second prong — deliberate indifference — plaintiffs must show that the officers were (a) *subjectively*

*aware* of the serious medical need and (b) failed to adequately respond. *Farmer*, 511 U.S. at 828.

### a.  Subjective awareness

[8] To be liable under the Eighth Amendment for denial of medical treatment to a detainee, an official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 834, 837. In other words, the official must demonstrate a *subjective awareness* of the risk of harm.

Ashton and Robertson do not dispute that they witnessed Clustka wrapping a seatbelt around her neck and yelling that she wanted to die. Rather, they assert that they did not believe Clustka's actions to be a "serious" threat or attempt of suicide. Put in *Farmer*'s terms, they contend that they did not "draw the inference," *id.*, that Clustka was genuinely at risk despite being "aware of facts from which the inference could be drawn," *id.* According to the officers, Clustka's actions seemed to them an attempt at manipulation. Once she realized that she was being transported to jail, Clustka tapped repeatedly on the surveillance camera to get the officers' attention but received no response. By wrapping the seatbelt around her neck, they explain, she was merely resorting to more dramatic measures to get the officers' attention, stop the paddy wagon, and avoid going to jail. The officers, moreover, recall discounting the seriousness of her actions on account of her state of intoxication. They also argue that Clustka could not have succeeded in killing herself because the seatbelt would have slackened around her neck once she passed out, thus her threat of suicide could not have been serious.

[9] We may not affirm the district court's grant of the defendants' motion for summary judgment, however, simply on the basis of the defendants' assertions as to their own state

of mind. Proof of "subjective awareness" is not limited to the purported recollections of the individuals involved. "Whether [an] official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Indeed, in certain circumstances, "a factfinder may conclude that [an] official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (internal quotations omitted). Here, there is sufficient circumstantial evidence to create a genuine issue of fact regarding defendants' subjective awareness of Clustka's serious medical need.

**[10]** First, the Conns have presented evidence from which the jury could conclude that Clustka's medical need was so obvious that Ashton and Robertson must have been subjectively aware of it, despite their later denial of that awareness. Clustka attempted to choke herself with a seat belt and screamed something to the effect of "kill me or I'll kill myself"; these are warning signs that are difficult for any observer to miss. The officers, moreover, admittedly knew that Clustka was mentally unstable and that she was undergoing a particularly stressful time. Clustka's detail report — which the officers requested and reviewed — cautioned: "violent tendencies, known to abuse substances, alcoholic, and other mental health problems." The report also indicated that Clustka's mother had obtained a restraining order against her. A reasonable jury could conclude that the officers' knowledge of Clustka's mental and emotional instability, coupled with their observation of her dangerous behavior, in fact produced a subjective awareness that Clustka was at acute risk of harm and suffered a serious medical need.

**[11]** Second, the Conns offer circumstantial evidence to explain *why* the officers might have failed to report the incident even if they were subjectively aware of Clustka's medical need. Both officers believed that failing to handcuff Clustka while transporting her, and failing to fasten her into

her seat belt once she unbuckled it, were violations of policy.[4] Had they reported the incident, they would have had to report their own misconduct. A jury could reasonably conclude that the officers had a motive for remaining silent.

**[12]** Finally, Ashton's comments both during and after the incident in the paddy wagon establish a genuine question of fact regarding his subjective awareness of the seriousness of Clustka's condition — as well as his discomfort with the way in which he and Robertson handled the situation. Ashton recalls telling Robertson at the time of the incident that Clustka "was trying to choke herself." The next day — the day before Clustka committed suicide — Ashton approached a senior officer expressing his discomfort with what had transpired. Later, when Ashton found out about Clustka's suicide, he told one deputy that Clustka had "attempted to choke herself" in the paddy wagon. A second deputy reported the following conversation:

> [Ashton] stated that "she looked out the back window and once she realized she was coming to Parr [the prison] she *tried to hang herself in the wagon*." He stated that he was "new" and therefore asked his (unidentified) partner and senior officer if they needed to write a report regarding *the suicide attempt*. He stated that his partner declined the idea of documenting this occurrence, therefore he did not.

(emphasis supplied). Ashton went on to say that he would write a report and that his "sergeant will be pissed." These statements — both contemporaneous and after-the-fact — could support a reasonable jury's conclusion that Ashton, at least, was subjectively aware of Clustka's serious medical

---

[4]It appears that this belief was not well-founded, and that the defendants may not have violated policy after all. That, however, is irrelevant; what matters is that the officers *believed* their actions violated policy and that they may have *feared* that the policy violation would be discovered.

need. That he brought his concerns to Robertson's attention is a factor to consider with respect to whether Robertson was also subjectively aware of the problem.

[13] We hold that, cumulatively, the above evidence is sufficient to create a material issue of fact on the question of the subjective awareness of both officers. This is particularly so because "questions involving a person's state of mind are generally factual issues inappropriate for resolution by summary judgment." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999) (quotation and internal alterations omitted). We, of course, "may not make credibility determinations or weigh conflicting evidence." *Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994). We must leave the question of subjective awareness to the jury.

### b. "Failure to respond"

[14] The officers did not take Clustka to the Medical Center, nor did they report her behavior to jail personnel or to their supervising sergeant; they did not even write an incident report on the day that Clustka tried to choke herself. The defendants do not argue that, if we find that the officers *were* subjectively aware of Clustka's serious medical need, they nonetheless responded appropriately. The defendants are not, therefore, entitled to summary judgment on the ground that the officers responded adequately to the situation presented.

### 3. "[H]arm caused by the indifference"

The question of causation is closer. We are satisfied, nonetheless, that the Conns presented sufficient evidence of actual and proximate causation to defeat summary judgment and give rise to a jury question whether the officers' omissions caused Clustka's eventual suicide.

### a. Cause in fact

[15] The officers' failure to report the choking incident and suicide threat "is the actual cause of [the] injury only if the

injury would not have occurred 'but for' that conduct." *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990) (citing W. Prosser & W. Keeton, *The Law of Torts* [hereinafter "Prosser & Keeton"] § 41, at 266 (5th ed. 1984)). "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978). The Conns contend that had the officers responded appropriately to her attempted choking and suicide threat, Clustka would not have committed suicide at the time she did and that the officers' failure to respond set in motion a sequence of events in which Clustka did not receive the medical treatment she urgently needed. We agree that the Conns have presented sufficient material evidence on cause in fact such that a jury could reasonably find in their favor.

The Conns argue that, had the officers properly responded to the choking incident and threat of suicide in either of two ways, they would have prevented her suicide less than 48 hours later. In support of this assertion, they presented expert testimony to establish the appropriate procedures for handling detainees who threaten suicide — procedures that were not followed here. Based on this testimony, the Conns assert that first, the officers could have properly taken Clustka directly to the hospital under a Legal 2000 procedure and reported the incident to hospital staff. Second, the officers could have continued on to the jail and reported the incident to jail personnel upon their arrival. At that point, jail personnel would have either (1) rejected Clustka at the door and sent her to the hospital, since the jail cannot provide medical treatment during civil protective custody; or (2) admitted her and placed her under suicide watch until she was detoxified, then evaluated her and sent her to the hospital under a Legal 2000. According to the plaintiffs, under either of these procedures Clustka would have received timely suicide intervention services by trained medical personnel who had full information about her

most recent suicide attempt. At this point, she would have been kept in the hospital for up to 72 hours or would have, in some other way, received appropriate services in response to her acute risk of suicide.

Defendants counter that the outcome of either of these procedures "amount[s] to mere speculation." They point to the fact that on two occasions, including on April 26, Clustka was evaluated at the emergency room and released soon thereafter without being transferred to a psychiatric facility. On three occasions between 2001 and 2005 when Clustka *was* transferred to NMHI, she did not stay there longer than a day. Defendants note that each time a patient is seen at the emergency room, the medical evaluation is based solely on the patient's psychological state at that moment. Because Clustka did not physically harm herself while in CPC on April 26, there is reason to think that she was no longer suicidal at the moment she was released. Consequently, had she been evaluated by medical staff at the prison or hospital at that time, even had the medical staff been fully informed of the choking incident and suicide threat, she may well have been released from the jail or from the emergency room without further intervention. Finally, defendants argue that even if the officers had notified jail or hospital personnel of Clustka's actions and she had been flagged as a suicide risk, if she had been released on April 26 (from either CPC or the emergency room), the information about the choking incident and suicide threat would not have been passed along to the jail intake personnel when Clustka was detained the next day on the misdemeanor charge; therefore, she would not have been put on suicide watch or treated any differently than she was.[5] The jail keeps minimal documentation regarding CPC detainees —

---

[5]The jail already *was* aware that a month earlier, Clustka had been put on suicide watch at the prison and that she had a history of mental health problems. For that reason she was placed in the mental health unit. Nonetheless, without the information about her most recent suicide attempt/threat, she was not placed on suicide watch on April 27, 2005.

apparently for privacy reasons — since these detainees have not been charged with a crime and are merely in custody for their own protection. As a result, there is an information gap between CPC and the criminal detention facilities at the jail, and mental health information about CPC detainees will generally be inaccessible if those individuals are later detained on a criminal charge. When, after being released on April 26, Clustka was picked up the next day on a misdemeanor charge, unless the same intake nurse was on duty as on the day before, it is likely that no one at the jail would have known that she had been flagged as a suicide risk in CPC the previous day, and her treatment would have been no different.

When presented to the jury, the defendants' argument may well succeed. It is not, however, sufficient to warrant judicial determination of causation as a matter of law. The defendants' argument rests on the questionable assumption that knowledge of Clustka's second suicide threat in two days, if reported upon her arrival at the jail or at a hospital, would not have raised an alarm for medical personnel such that Clustka would have received more precautionary treatment than she otherwise did. It presupposes, moreover, that any such treatment would have been ineffective and that, regardless, the subsequent events would have occurred when they did. It makes little sense, however, to argue that the failure to provide access to suicide prevention services has no causal effect on a suicide that transpires less than 48 hours later. If suicide intervention is expected to have no impact on whether someone attempts suicide, why would the City ever bother with the Legal 2000 procedure? Suicide prevention services are designed to assess the patient and release her *only* after a determination that she is no longer at risk. In Clustka's case, this determination *was never made by someone who had all the requisite information about her psychological instability at the time*. A jury could reasonably find that the defendants' failure to report critical information rendered the subsequent medical evaluations ineffectual. Clustka's suicide might well have been prevented by effective medical intervention —

such as holding her on a Legal 2000 for up to 72 hours — but that intervention would likely have occurred only if the crucial information about the choking incident and suicide threat were known by the persons making the necessary determinations.

**[16]** We cannot affirm the grant of a motion for summary judgment where, as here, each side has garnered substantial evidence in support of its position, and important facts, including the proper intake procedures for an intoxicated, suicidal detainee, remain in dispute. The Conns have presented evidence that knowledge of Clustka's suicide attempt and threat of future suicide would have made a difference in her medical evaluation, treatment and supervision. We construe that evidence in the light most favorable to the Conns. *McDonald*, 548 F.3d at 778. There need only be "evidence in the record to support the inference that if medical staff had evaluated [Clustka], prevented [her] from entering the jail, and directed [her] to a mental hospital [Clustka] almost certainly would have received the care [s]he needed, rather than face conditions that worsened [her] outlook." *Gibson*, 290 F.3d at 1190. As the Conns have met their burden, we will leave the jury to its proper function of assessing the weight and credibility of that evidence as well as that presented by the defendants. *See Bator*, 39 F.3d at 1026.

### b. Proximate cause

**[17]** "Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff 's injury, there remains the question whether the defendant should be legally responsible for the injury." *White*, 901 F.2d at 1506 (citing Prosser & Keaton, § 42 at 272-73). The officers' conduct "is not the proximate cause of [Clustka's] alleged injuries if another cause intervenes and supersedes [their] liability for the subsequent events." *Id.* (quoting Restatement (Second) of Torts §§ 440-53 (1965)). However, "*foreseeable* intervening causes . . . will not supersede the defendant's responsibili-

ty." *Id.* (citing Prosser & Keeton, § 44 at 303-04) (emphasis added). If "reasonable persons could differ" over the question of foreseeability, "summary judgment is inappropriate and the question should be left to the jury." *Id.*

Where defendant's actions are a "moving force" behind a series of events that ultimately lead to a foreseeable harm, defendant is not relieved of liability on account of the intervening acts. *See id*; *see also Duffy*, 588 F.2d at 743; *Cabrales v. County of Los Angeles*, 864 F.2d 1454 (9th Cir. 1988), *vacated*, 490 U.S. 1087 (1989), *reinstated*, 886 F.2d 235 (9th Cir. 1989). In *White*, defendant prison guards tried to force the plaintiff into a violent inmate's cell; the plaintiff resisted, attempted to run, and subsequently suffered injury from the guards. 901 F.2d at 1503. We held that the defendants' actions were a "moving force" behind the plaintiff's attempt to run and that, because it was foreseeable that the plaintiff would resist entering the cell, his attempt to run was not an intervening cause. *Id.* at 1505-06. In *Cabrales*, which involves municipal rather than individual liability, an inmate made a suicidal gesture while in isolation, after which prison officials released him to the general jail population. *Cabrales*, 864 F.2d at 1457. Subsequently, he got into a fight and was subjected to ten days in isolation, during which time he committed suicide. *Id.* We held that the County's inadequate provision of psychiatric care was a "moving force" behind the suicide. *Id.* at 1461. Similarly, a jury could reasonably find that the officers' failure to respond to Clustka's suicidal actions was a "moving force" behind her suicide.

[18] Defendants argue that two principal intervening causes of Clustka's suicide supersede whatever responsibility they might otherwise have had for causing her death. First, they argue that because Clustka was medically evaluated three times after the choking incident and suicide threat and each time determined not to be at risk of suicide, her suicide could not have been caused by the officers' failure to report it. We disagree. At none of the three examinations, two of which

were cursory jail admission screenings, was potential suicide a cause for or the subject of the review. When medical examiners have insufficient information about the patient they are diagnosing, they are likely to give an inaccurate diagnosis. By failing to report Clustka's choking and threat of suicide, the officers rendered these reviews of little value. More important, by doing so, they foreseeably undermined her access to effective medical evaluations and adequate mental health care. A jury could reasonably conclude that notwithstanding the subsequent uninformed medical reviews, the failure to take action following the incident in the paddy wagon was a moving force and proximate cause of Clustka's suicide.

**[19]** Second, defendants argue that Clustka's subsequent arrest and detention on a misdemeanor charge was an intervening stressor that directly caused the suicide, breaking the chain of causation. Again, however, plaintiffs have presented sufficient material evidence to raise a jury question on the issue of foreseeability. Even if she had not been detained again, it was clear from the officers' direct observations of Clustka and from her detail report that she was mentally unstable, that she suffered from alcohol and substance abuse, and that she was having family troubles that exacerbated these problems. In these circumstances, an incident that would further destabilize her — whether detention or some other similar intervening force — was entirely foreseeable.

**[20]** Construing all the evidence in the light most favorable to the Conns, *McDonald*, 548 F.3d at 778, we conclude that they have presented sufficient evidence of foreseeability that the question of proximate cause must be decided by a jury.

## B.   Qualified immunity

**[21]** We next assess whether summary judgment is warranted because the defendants are entitled to qualified immunity. We apply a two-part inquiry: First, did the defendants' actions violate the Constitution? Second, if so, was the right

violated clearly established? *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) (holding the "sequence set forth [in *Saucier*] is often appropriate" but not mandatory). Having determined that there is a question for the jury on the first prong, we consider whether we should nonetheless affirm the grant of summary judgment at this stage because the constitutional rights at issue have not been clearly established. This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. Officers are entitled to qualified immunity if they reasonably misapprehend how the law would govern in their particular situation. *Id* at 205.

**[22]** Qualified immunity is not warranted here. It is clearly established that the Eighth Amendment protects against deliberate indifference to a detainee's serious risk of suicide. *See Cabrales*, 864 F.2d 1454; *Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003); *Colburn*, 946 F.2d at 1023. When a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety. Thus, the constitutional right at issue here has been clearly established. Nevertheless, for the same reason that we cannot determine at summary judgment whether a constitutional violation occurred, a grant of summary judgment to either party with regard to qualified immunity would be inappropriate.

## C.    Municipal liability

Under *Monell*, a municipality is a legal "person" subject to liability under § 1983 for injuries it inflicts through deliberate indifference. *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978). Municipal liability may be

established on account of the city's deliberate acts or omissions; liability under the theory of respondeat superior, however, is insufficient to support a § 1983 violation. *Id.* at 691; *Gibson,* 290 F.3d at 1185-86. Municipal liability for a failure to act requires a showing "(1) that a [municipal] employee violated the plaintiff's constitutional rights; (2) that the [municipality] has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Long v. County of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *Gibson*, 290 F.3d at 1193-94). Because we have denied the defendants' motion for summary judgment on the constitutional claims against Robertson and Ashton, the first prong has been met for the purposes of summary judgment here as well.

The Conns seek to establish municipal liability on account of four separate omissions: (1) failure to train; (2) failure to adopt and implement policies; (3) failure to address Officer Robertson's deficient performance; and (4) failure to discipline. We consider each of these claims in turn.

## 1.    Failure to Train

**[23]** "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Deliberate indifference by the municipality may be established where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long*, 442 F.3d at 1186 (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

Under this standard, the Conns have established a genuine issue of fact for the jury on the question of the City of Reno's failure to train. First, they have provided substantial evidence in the form of deposition testimony that before Clustka's sui-

cide the City did, in fact, fail to train its officers in suicide prevention and the identification of suicide risks. The City of Reno has not provided any evidence to the contrary.

Second, plaintiffs have provided evidence that officers predictably face situations where they must assess and react to suicide risks in order to prevent grave harm to people under their protection. Suicide is a leading cause of death in American prisons, Shevon L. Scarafile, *"Deliberate Indifference" or Not*, 51 Vill. L. Rev. 1133, 1133-34 & n.4 (2006), and Clustka's suicide was one of six in less than two years at the Washoe County Jail. While police officers are not prison guards, they are the first law enforcement officials to deal with detainees — and they do so in highly stressful situations. Robertson testified that over the course of his career, he has encountered between 500 and 1,000 people threatening to kill themselves. Police officers frequently take mentally ill detainees to the hospital on Legal 2000s. The failure to train officers on how to identify and when to report suicide risks produces a "highly predictable consequence": that police officers will fail to respond to serious risks of suicide and that constitutional violations will ensue.

Finally, plaintiffs have made an adequate showing that, had the City trained its officers, the violation of Clustka's constitutional rights could have been avoided. For a policy to be a moving force behind the violation of a constitutional right, the failure of the policy or omission must be "closely related to the ultimate injury." *Gibson*, 290 F.3d at 1196 (quoting *Canton*, 489 U.S. at 391). Here, Robertson and Ashton believed that they had the discretion not to report the choking incident and suicide threat in the paddy wagon. Had they been trained in suicide prevention, there is a reasonable probability that they would have responded differently and reported to the jail that Clustka was at risk of suicide, or taken her directly to the hospital.

**[24]** For these reasons, plaintiffs have presented sufficient evidence to establish a genuine issue of fact with respect to

municipal liability for failure to train. Because the City failed to train its police officers in suicide prevention, a reasonable jury could find that the City's "customs or policies . . . amount to deliberate indifference;" and because Ashton and Robertson, who never received such training, failed to respond appropriately by reporting the incident in the paddy wagon, there is sufficient evidence for a reasonable jury to find "that these customs or policies were the moving force behind the employee[s'] violation of constitutional rights." *Long*, 442 F.3d at 1186. "[W]hether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Gibson*, 290 F.3d at 1194-95. We are compelled to deny the motion for summary judgment on municipal liability for failure to train.

## 2. Failure to Adopt and Implement Policies

Plaintiffs also challenge the lack of an official, written policy on suicide prevention. "This Court consistently has found that a county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the county had other general policies in place." *Long* 442 F.3d at 1189.

The Conns assert — and appear to be correct — that there was no written policy on reporting suicide threats at the time of Clustka's suicide,[6] although there were written policies regarding the Legal 2000 procedure. The absence of any written policy is supported by the fact that neither Robertson nor Ashton was disciplined for failing to report Clustka's suicide threat, although each received negative comments about the incident in their annual evaluation. Post-event evidence, such as this, is admissible to prove the absence of a municipal

---

[6]Deputy Chief Johns was "not sure" if there was a written policy requiring officers to report suicide threats.

defendant's policy or practice. *Henry v. County of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997).

Shortly after Clustka's suicide, moreover, the City implemented a new suicide prevention policy. At intake in the jail, the arresting officer must now fill out a form answering a series of questions concerning the detainee's mental health, including questions about suicide risk. This is further evidence that as of April 26, 2006 no such policy had been adopted and implemented.[7]

[25] As the Conns have presented sufficient evidence of a failure to adopt and implement suicide-prevention policies so as to give rise to a jury question, the rest of our analysis mirrors that which we described above regarding the failure to train. Given the predictability of suicide risk among detainees, and the likelihood of constitutional violations if suicide threats go unreported, the plaintiffs have presented a genuine issue for the jury on whether the failure to adopt and implement policies on suicide prevention was deliberately indifferent, and whether that deliberate indifference was a "moving force" behind the violation of Clustka's constitutional rights.

### 3. Failure to address the deficient performance of Officer Robertson

[26] Whatever Robertson's on-the-job weaknesses may have been, there is no evidence in the record that the municipality should have known — or did know — that Robertson would be likely to show deliberate indifference in circumstances such as these. Moreover, the causal link between the City's failure to address his deficient performance in other aspects of his job and his failure to respond appropriately here is tenuous at best. Accordingly, we affirm the grant of summary judgment on this issue.

---

[7]The evidence of the new policy is admissible solely as evidence of the absence of an earlier policy and not for the purpose of proving negligence or culpable conduct of any kind. See Fed. R. Evid. 407.

### 4. Failure to discipline

Robertson and Ashton were not disciplined in any way for their misconduct in failing to report the choking incident and suicide threat. They each received some negative comments about their handling of the situation in their annual reports, written by their supervising sergeant.

**[27]** A failure to discipline is not a separate ground for establishing municipal liability. Rather, it is evidence that tends to establish the absence of or failure to enforce a policy on suicide prevention. We will therefore affirm the district court's grant of summary judgment on this issue as well, without commenting on the admissibility of the particular evidence regarding the two officers for the purpose described above.

## IV. CONCLUSION

Clustka's surviving children have presented sufficient evidence to survive summary judgment on the large majority of the claims brought under § 1983. On the basis of the evidence presented by the Conns, the jury could reasonably find that Clustka demonstrated a serious medical need when she attempted to choke herself with a seatbelt in the paddy wagon and threatened to kill herself; that Ashton and Robertson were deliberately indifferent to that medical need; and that their indifference was a factual and proximate cause of Clustka's death. On the basis of the Conns' evidence, a jury could also reasonably determine that the City of Reno's failure to train its law enforcement officials and implement written policies on suicide prevention constituted deliberate indifference and were, independently, a moving force behind Ashton and Robertson's violation of Clustka's constitutional rights.

We therefore reverse the district court's grant of the defendants' motion for summary judgment with respect to individual and municipal liability, with the exception that we affirm

the grant of summary judgment with respect to the City's failure to address Robertson's deficient performance and its failure to discipline the individual officers. The case is remanded to the district court for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**