**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESLEY SIMMONS, husband;
SHARON SIMMONS, wife,
      *Plaintiffs-Appellants,*

       v.

NAVAJO COUNTY, State of Arizona;
NAVAJO COUNTY BOARD OF
SUPERVISORS, governing board of
Navajo County, Arizona; GARY
BUTLER, Sheriff of Navajo County;
DAVID BURKE, Jail Commander,
Navajo County; REYNOLDS,
Lieutenant; A. WARREN, Sergeant;
DEBORAH JONES, nurse and staff;
KARTCHNER, Dr. and staff; GENIE
GREASON, nurse,
      *Defendants-Appellees.*

No. 08-15522

D.C. No.
06-CV-00701-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
September 3, 2009—San Francisco, California

Filed June 23, 2010

Before: J. Clifford Wallace, Diarmuid F. O'Scannlain and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge O'Scannlain

9175

**COUNSEL**

John Trebon, John Trebon, P.C., Flagstaff, Arizona, argued the cause for the appellants and filed the briefs.

James M. Jellison, Jellison Law Offices, PLLC, Phoenix, Arizona, argued the cause for the appellees and filed a brief.

David L. Abney, Law Offices of Charles M. Brewer, Ltd., Phoenix, Arizona, filed a brief in support of the appellants on behalf of amicus curiae Arizona Trial Lawyers Association.

Eileen Dennis GilBride, Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona, filed a brief in support of the appellees on behalf of amici curiae Apache, Cochise, Gila, Graham, Greenlee, La Paz, Mohave, Pinal, Santa Cruz and Yavapai Counties.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide, among other issues, whether local jail personnel, their supervisors, and their county employer violated the Fourteenth Amendment due process rights of a pretrial detainee who committed suicide while in their custody.

### I

### A

After allegedly molesting a ten-year-old girl at an elementary school playground, Jasper Simmons ("Jasper") was arrested by the Pinetop-Lakeside Police Department and charged in Arizona Superior Court with sexual conduct with a minor under fifteen years old. Jasper was only seventeen years old at the time, but because of the nature of the crime, he was charged as an adult and ordered into adult detention at Navajo County Jail in Holbrook, Arizona. Navajo County Jail very rarely housed juveniles, who are required by Arizona law to be physically segregated from adults with no sight or sound contact between the juvenile and any charged or convicted adult. Jasper was assigned to a special two-room cell ("I-pod"), the only one in the jail that provided the required sight-and-sound segregation.

On May 21, 2005, he underwent an initial inmate assessment, in which he denied receiving mental health counseling, having suicidal thoughts, or having a family history of sui-

cide. A week later, however, Jasper informed a detention officer that he had tried to kill himself by cutting his left wrist with a razor. Jasper was taken to the nurses' station, where Nurse Genie Greason cleaned and dressed his wounds, which she described on his chart as "superficial cuts + scrapes + abrasions."

Nurse Greason ordered Jasper to be placed on Suicide Watch Level I, which is designated for inmates who are imminently suicidal. Level I required constant observation and documentation of the inmate's behavior every fifteen minutes, a face-to-face evaluation by medical staff at least once a day, and additional evaluation by the Community Counseling Center if warranted. Under Level I, an inmate was required to wear a special smock that could not be used as a suicide implement, and any potentially dangerous items were removed from the inmate's cell. Moreover, the inmate could not participate in any programs or activities.

The jail's medical staff saw Jasper every day from May 28 to June 3. His treatment chart indicates that his wounds were regularly cleaned and dressed, and that he denied having suicidal thoughts. Nurse Debra Jones referred Jasper to see Maggie Lange, a licensed clinical social worker at the Community Counseling Center who visited the jail weekly. On June 3, Lange evaluated Jasper, who again denied having suicidal thoughts. Lange noted that Jasper had a history of taking antidepressants and had recently attempted suicide. She recommended that he see Ellen Morse, a nurse practitioner specializing in mental health issues, and that he remain on suicide watch.

On June 8, Nurse Jones decided to downgrade Jasper to Suicide Watch Level II, which is designated for inmates whose behavior indicates emotional instability. Like Level I, Level II required documented checks every fifteen minutes and daily face-to-face evaluations by medical staff. Level II inmates could wear regular clothing, but the items in their cell

were still restricted, and they were still prohibited from participating in programs and activities.

On June 10, Jasper saw Lange again and asked for antidepressants, but he denied suicidal ideation. He reported feeling better now that he was allowed to have books but also reported having difficulty sleeping. On June 15, he saw Morse, who recorded his history of taking antidepressants and his suicide attempt but noted that he denied suicidal ideation. She diagnosed him with depression and prescribed an antidepressant. She arranged for a two-week follow-up visit.

At his next weekly visit with Lange on June 17, Jasper reported that he was "doing better," and she noted that he appeared "less depressed." He told her that he talked to his parents every day. The following week, on June 24, he again reported that he was doing better and could "tell the medicine is working." Lange noted that his mood had improved and that he appeared stable. Nevertheless, on June 27, Nurse Jones decided to keep Jasper on Level II watch as a precaution until his case management conference on July 19.

On June 29, Morse conducted another psychiatric interview. She noted that Jasper was "doing better overall" and reported being in a "better mood." Although Jasper reported feeling isolated and lonely and still had trouble sleeping, he was seeing his family weekly and reading more. Morse observed that Jasper seemed "more relaxed and talkative" and "less depressed." On July 1, Nurse Greason documented that Jasper seemed "cheerful" and was "looking forward to seeing [his] parents." At that time, he denied suicidal ideation yet again.

On Saturday, July 2, Sergeant Albert Warren was the officer in charge of Navajo County Jail. That day, three detention officers were out sick, and there were at least nine inmates on suicide watch, which was a record high for the jail. It was also an extremely busy day at the jail, given that it was a visitation

day during the Fourth of July weekend. That afternoon, Jasper visited with his family from about 1:30 to 2:40 p.m. His father reported that Jasper was in "pretty good spirits," and his mother recalled that "he was in a good mood." Neither of his parents suspected that he would attempt suicide later that day.

Sergeant Warren took Jasper back to his cell around 2:50 p.m. but did not notice anything amiss in terms of Jasper's demeanor. Sergeant Warren checked in on Jasper again at 4:35 p.m. when he delivered a dinner tray. At 5:20 p.m., while retrieving dinner trays from the inmates, Sergeant Warren responded to a security breach in the medical pod where all of the medications for the inmates were stored. Afterward, he proceeded to booking, where he briefed Officer Tim Robinson, Jr., who was relieving him of duty that evening, on the security breach.

At 5:46 p.m., an hour and eleven minutes after Sergeant Warren last checked on Jasper, Officer Randall Ratcliff visited Jasper's cell to collect his dinner tray. At that time, he discovered Jasper "hanging from the top slide lock of his cell door by what appeared to be some type of home made rope." The rope was fabricated from medical gauze, presumably his old wrist wound dressings. Jasper was pronounced dead at 6:50 p.m.

B

Jasper's parents, Wesley and Sharon Simmons ("the Simmonses"), filed a complaint against various jail personnel, their supervisors, and Navajo County (collectively, "Navajo County")[1] in the Navajo County Superior Court. The Sim-

---

[1]"Navajo County" comprises the individual defendants (Nurse Jones, Nurse Greason, and Sergeant Warren); the supervisory defendants (Dr. Kartchner, Lieutenant Reynolds, Commander Burke, and Sheriff Butler); and the municipal defendants (Navajo County, its Board of Supervisors, and Sheriff Butler in his official capacity). It does not include Officers Stump, Robinson, Ratcliff, Nabors, Crandell, and Peterson, who were initially named in the complaint but dismissed from suit prior to summary judgment.

monses asserted claims under state tort law, 42 U.S.C. § 1983, and the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"). Navajo County removed the case to the United States District Court for the District of Arizona pursuant to 28 U.S.C. §§ 1441(b) and 1446. The parties filed cross-motions for summary judgment, and the district court granted Navajo County's motion and denied the Simmonses' motion. The Simmonses timely appealed from the district court's summary judgment to Navajo County.

## II

As a preliminary matter, we address the Simmonses' argument that the district court's grant of summary judgment to Navajo County "was not procedurally justified." They contend that the district court improperly dismissed their case as a sanction for violating the District of Arizona's Local Rule of Practice 56.1(e).

**[1]** Rule 56.1(e) provides that " [m]emoranda of law filed . . . in opposition to a motion for summary judgment . . . shall include citations to the specific paragraph in the statement of facts that supports factual assertions made in the memoranda." The district court held that the Simmonses' memorandum in opposition to Navajo County's motion for summary judgment violated Rule 56.1(e) because it "cite[d] often to their *entire* statement of facts and their *entire* opposition to [Navajo County's] statement of facts, a collection of documents spanning 98 pages and 630 numbered paragraphs" with "some 12 inches of related exhibits." Nevertheless, the district court still "made its best effort to identify the relevant evidence from [their] voluminous filings" and ruled on the merits of the Simmonses' claims. The court's evaluation of the merits makes clear that it did not, as the Simmonses contend, dismiss their case as a sanction.

**[2]** Although the Simmonses' argument fails, we pause here to explain, yet again, the importance of following a dis-

trict court's local rules. "District courts have broad discretion in interpreting and applying their local rules." *Miranda v. S. Pac. Transp. Co.*, 710 F.2d 516, 521 (9th Cir. 1983). Therefore, we have previously upheld a district court's summary judgment where there was a violation of "a pertinent local rule expressly indicat[ing] that the [nonmoving party] had an affirmative burden to list genuine issues with appropriate record citations in order to withstand the motion for summary judgment." *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. La. Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988) (per curiam). Because a district court has no independent duty "to scour the record in search of a genuine issue of triable fact," and may "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment," we emphasize that the district court in this case was under no obligation to undertake a cumbersome review of the record on the Simmonses' behalf. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001) ("[T]he district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein.").

## III

We now turn to the merits of the Simmonses' section 1983 claims to "determine, viewing the evidence in the light most favorable to the nonmoving party, whether genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law." *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).[2]

---

[2]Navajo County urges the panel to limit its review to "facts that were properly brought to the district court's attention." However, the "principal policy behind local rules like Rule 56.1 is to obviate the need for the *district court* to search the record for facts relevant to summary judgment." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 914 n.25 (9th Cir. 2008) (emphasis added). Therefore, "[s]uch a policy has no impact on the scope of our *appellate* review." *Id.*

### A

The Simmonses allege that Nurse Jones, Nurse Greason, and Sergeant Warren violated Jasper's due process rights under the Fourteenth Amendment.

**[3]** Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees, *Bell v. Wollfish*, 441 U.S. 520, 537 n.16 (1979), we apply the same standards in both cases, *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1243-44 (9th Cir. 2010) (rejecting the contention that mentally ill pretrial detainees are entitled to greater protection under the Fourteenth Amendment). "We have long analyzed claims that correction facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention) under a 'deliberate indifference' standard." *Id.* at 1241. A prison official cannot be liable for deliberate indifference unless he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, a plaintiff must show that the official was "(a) *subjectively aware* of the serious medical need and (b) failed adequately to respond." *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010) (citing *Farmer*, 511 U.S. at 828), *petition for cert. filed*, 78 U.S.L.W. 3670 (U.S. May 6, 2010) (No. 09-1361).

**[4]** The parties do not dispute that Jasper had a serious medical need, and we have previously recognized that a heightened suicide risk can present a serious medical need. *See id.* at 1095. Therefore, we turn to the issue of whether the individual defendants knew of but disregarded such risk. *Farmer*, 511 U.S. at 828.

1

Although the Simmonses acknowledge that Nurse Jones "was concerned about Jasper Simmons' emotional state," and "properly kept [Jasper] on suicide watch" as a precaution despite his improving mood, they nonetheless contend that she was deliberately indifferent.

**[5]** To proceed to trial, the Simmonses must adduce evidence raising a triable issue that Nurse Jones knew Jasper was "in substantial danger" of killing himself yet deliberately ignored such risk. *Clouthier*, 591 F.3d at 1248. Here, Nurse Jones was aware that Jasper had previously attempted to take his own life, suffered from depression, and was at some risk of making another attempt. We cannot agree, however, that the evidence supports the inference that Nurse Jones knew that Jasper "was at *acute* risk of harm" at the time he killed himself. *Conn*, 591 F.3d at 1097 (emphasis added). By July 2, over a month had elapsed since his suicide attempt with the razor, during which time Jasper received counseling, took antidepressants, and by all accounts, was doing better. Although she testified that Jasper seemed "sulky" at times, "[h]e seemed like an average teenager to [her] as far as his behavior." Not only were her own interactions with Jasper unremarkable, but she also had no reason to believe from the treatment notes of the social worker and psychiatric nurse practitioner, which she reviewed as part of Jasper's chart, that Jasper was on the brink of killing himself.

**[6]** We reject the contention that Nurse Jones' decision to keep Jasper on suicide watch until his case management conference on July 19 creates an inference of subjective awareness that Jasper was in "substantial danger." "Placing a pretrial detainee on some level of suicide watch, even the highest level, does not demonstrate a subjective awareness of a substantial risk of *imminent* suicide." *Collignon v. Milwaukee County*, 163 F.3d 982, 990 (7th Cir. 1998) (emphasis added). There is no indication that in the hours before Jasper's sui-

cide, Nurse Jones "observed suicidal actions, heard statements of a suicidal nature, or witnessed other evidence of [Jasper's] suicidal intent" that would have alerted her to Jasper's impending suicidal crisis. *Clouthier*, 591 F.3d at 1246 n.4. Indeed, Nurse Jones was off duty that weekend and could not have observed his behavior leading up to his suicide. Moreover, her decision to keep Jasper on Level II watch, despite the apparent improvement in his condition, stemmed from her uncertainty about how the case management conference— weeks into the future—would affect him. She testified that "[s]ometimes case managements mean a lot, sometimes they don't," and that she wanted to have a chance to evaluate his reaction to the conference before changing his status.

**[7]** In short, this is not a case where a jail official knew a pretrial detainee was actively suicidal but failed to ensure that precautionary measures were undertaken, *Conn*, 591 F.3d at 1098, or unilaterally halted such measures despite a belief that he was not yet "out of the woods," *Clouthier*, 591 F.3d at 1245. While Nurse Jones believed Jasper was at some risk of suicide warranting continuing precautions, "[t]here is no evidence that [she] was subjectively aware that [Jasper] was actively suicidal at the time [she] left [her] shift." *Id.* at 1247.

The Simmonses argue that Nurse Jones was deliberately indifferent because she failed to ensure that Jasper had daily evaluations pursuant to the suicide prevention policy. However, in the absence of evidence that she knew Jasper was in suicidal crisis, the Simmonses cannot prove at trial that "she actually inferred . . . that [Jasper] was at serious risk of harm if he did not receive proper care." *Id.* at 1244 (internal quotation marks omitted).

The Simmonses also argue that Nurse Jones should have informed the jail staff of Jasper's suicide risk. Although she "could have taken the extra step of informing [the jailers] about [Jasper's] suicidal tendencies, we cannot say that her failure to do so was deliberately indifferent in light of what

she knew both about the risk and the precautionary actions undertaken to protect [him]." *Brown v. Harris*, 240 F.3d 383, 391 (4th Cir. 2001).

Finally, the Simmonses contend that Nurse Jones's failure to retrieve Jasper's used gauze constituted deliberate indifference. They point to no evidence in the record, however, that she was even aware that Jasper had accumulated the gauze. She testified that it was her practice to dispose of the used dressings in a waste disposal cart, and that she had no idea how Jasper had obtained so much gauze. No reasonable jury could thus conclude that Nurse Jones *consciously* disregarded an excessive risk to Jasper's safety.

**[8]** We make no determination as to whether Nurse Jones's decision to transfer Jasper from Level I suicide watch to Level II was medically prudent under the circumstances. As this case demonstrates, simply because those with depression and suicidal inclinations "appear" to be getting better does not necessarily mean that they are. However, "[d]eliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Although in hindsight, Nurse Jones may not have made the best or even the proper medical decisions, what is important for the analysis in this case is that her decisions do not evidence deliberate indifference. Indeed, the Simmonses' own expert, Dr. Joel Dvoskin, testified that he "d[id]n't have any reason to believe that she was deliberately indifferen[t]." Having discerned no reason to disagree, we conclude that the district court properly granted summary judgment on the section 1983 claim against Nurse Jones.

2

The Simmonses also allege that Nurse Greason was subjectively aware of Jasper's risk of suicide yet failed to take ade-

quate precautions. They contend that she "effectively noticed, but did not document a significant change in the mood and behavior of Jasper Simmons from July 1 to July 2, 2005." They point to her deposition testimony that he was cheerful on July 1, yet when she tried to speak with him the next morning, Jasper waved her away because he was absorbed watching television. However, no reasonable jury would conclude that a teenager who did not want to be interrupted while watching television was obviously suicidal and required intervention. Nurse Greason did not think Jasper seemed depressed or agitated at the time, and the Simmonses point to no evidence to refute her testimony.

The Simmonses repeat their arguments regarding failure to perform daily evaluations, failure to inform jail staff of Jasper's suicide risk, and failure to retrieve the used gauze. For the reasons stated above, we reject such contentions and conclude that summary judgment in Nurse Greason's favor was proper.

3

The Simmonses next argue that Sergeant Warren's failure to check on Jasper every fifteen minutes as required by Navajo County Jail's suicide prevention policy, as well as his failure to search Jasper's cell, which might have led to the discovery and confiscation of the medical gauze Jasper ultimately used to hang himself, constituted deliberate indifference.

The Simmonses assert that Sergeant Warren was subjectively aware that Jasper "presented a substantial risk of suicide" because he "previously attempted to commit suicide and was on 'suicide watch.' " But the record belies such assertion. It is uncontested that Sergeant Warren did not know about Jasper's previous suicide attempt and never noticed a wrist injury or gauze dressings. He did not know Jasper was suffering from depression and taking antidepressants. He never

heard Jasper make a suicidal threat or gesture, and during his interactions with Jasper on July 2, he saw "nothing that would send up a red flag." In short, all he knew was that Jasper was on Level II suicide watch, which is designed for emotionally unstable, rather than imminently suicidal, detainees.

**[9]** While Jasper's suicide watch status may have alerted Sergeant Warren to the possibility of suicide, we cannot say that the magnitude of the risk was "so obvious that [he] *must* have been subjectively aware of it." *Conn*, 591 F.3d at 1097 (emphasis added); *see also Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002) (holding that officers cannot be held liable for deliberate indifference unless an inmate "was so obviously mentally ill that the deputies, who had received no training regarding the diagnosis and treatment of mental illness, *must* have known that [he] was exhibiting symptoms of mental illness" (emphasis added)). "In the absence of a risk so 'obvious' that [Sergeant Warren] must have drawn an impermissible inference," the evidence is insufficient to allow a jury to conclude that his conduct violated Jasper's due process rights. *Clouthier*, 591 F.3d at 1247.

**[10]** "Once a suicide has been accomplished in spite of preventive measures, it is all too easy to point out the flaws of failure." *Rellegert v. Cape Girardeau County*, 924 F.2d 794, 796 (8th Cir. 1991). Although a "jury might reasonably conclude that [Sergeant Warren] acted imprudently, wrongly, or negligently" by failing to check on Jasper more often and failing to conduct a thorough cell search, the question before us "is not whether [he] did all [he] could have, but whether [he] did all the Constitution requires." *Id.* at 797-98. Because the Simmonses have adduced no evidence that Sergeant Warren knew that Jasper was suicidal, we agree with the district court's summary judgment in favor of Sergeant Warren on the section 1983 claim.

B

The Simmonses allege that the supervisors of Sergeant Warren, Nurse Jones, and Nurse Greason are liable under section 1983 for failure to train or supervise them.

**[11]** In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court explained that in a section 1983 action, "the term 'supervisory liability' is a misnomer," since "[e]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 1949. To survive summary judgment, the Simmonses must therefore adduce evidence that Lieutenant Reynolds, Commander Burke, Sheriff Butler, and Dr. Kartchner themselves acted or failed to act unconstitutionally, not merely that a subordinate did. *See Conn*, 591 F.3d at 1096. The Simmonses presented no such evidence. Consequently, the district court properly awarded summary judgment to the supervisors.

C

**[12]** The Simmonses also asserted a section 1983 claim against Navajo County, its Board of Supervisors, and Sheriff Butler in his official capacity under the theory of municipal liability. Because we hold that there was no underlying constitutional violation, the Simmonses cannot maintain a claim for municipal liability. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996).

IV

The Simmonses contend that Jasper's depression was a disability under the ADA, and that Navajo County failed to accommodate his disability by denying him access to outdoor recreation. The Simmonses also argue that the County violated the ADA by failing to place Jasper in a more appropriate facility.

**[13]** Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Supreme Court has held that Title II applies to state prisons. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001).

To state a claim under Title II of the ADA, the plaintiff must allege:

> (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability.

*McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (internal quotation marks omitted).

**[14]** Assuming without deciding that Jasper's depression was a disability under the ADA, we focus here on whether Jasper's exclusion from outdoor recreation was by reason of his depression. The Simmonses contend that Jasper's depression caused his suicide attempt, which caused him to be placed on suicide watch, which caused him to be deprived of outdoor recreation. Ergo, they conclude that Jasper "was deprived of recreation because of his depression."

**[15]** We disagree. First, it is undisputed that Jasper was deprived of outdoor recreation even before his placement on suicide watch, since it was impossible to move him to the out-

door recreation area without violating the sight-and-sound segregation requirement of Arizona Revised Statute section 8-305(B). Second, even if the jail had imposed the recreation restriction only after Jasper's placement on suicide watch, the Simmonses have failed to adduce any evidence that the restriction was anything but a legitimate effort to protect Jasper from self-harm. Even if Jasper were a qualified individual with a disability and was denied access to outdoor recreation or other programs at the jail, such denial was not because of his depression, but due to a jail policy restricting the activities of inmates on suicide watch. Moreover, even assuming that transfer to some other prison facility might have been a reasonable accommodation, there is no evidence that such a transfer was ever sought or denied, let alone that such denial was because of or motivated by Jasper's depression. Likewise, assuming that Jasper could have been housed in some other room in the Navajo County Jail, there is no evidence that the County's failure to do so was motivated by his depression; rather, it appears undisputed that the county placed him in the cell because that was the cell customarily assigned to juveniles. We therefore conclude that the Simmonses failed to raise a triable issue with respect to whether Jasper's depression was a "motivating factor" in the decision to exclude him from recreation or other programs, nor did it motivate the decision to house him in the I-pod in Navajo County Jail, as opposed to in some other room or in some other facility. *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005).

Moreover, to the extent that the Simmonses argue that Navajo County violated the ADA by depriving Jasper of "programs or activit[ies] to lessen his depression," such argument is not actionable under the ADA. The ADA prohibits discrimination because of disability, not inadequate treatment for disability. *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners

. . . . The ADA does not create a remedy for medical malpractice.").

Because the Simmonses cannot make out a prima facie case of disability discrimination, we conclude that the district court properly granted summary judgment to Navajo County on the ADA claim.

V

**[16]** Finally, we address the Simmonses' argument that the district court erred in dismissing their state law claims on the basis of a deficient notice of claim under Arizona Revised Statute section 12-821.01. This statute requires that a person with a claim against a public entity or employee file notice of that claim within 180 days after the accrual of the cause of action. Ariz. Rev. Stat. § 12-821.01. Such claim must "contain a specific amount for which the claim can be settled and the facts supporting that amount." *Id.* § 12-821.01.A. "Claims that do not comply with A.R.S. § 12-821.01.A are statutorily barred." *Deer Valley Unified Sch. Dist. v. Houser*, 152 P.3d 490, 492 (Ariz. 2007) (en banc). The district court held that because the Simmonses' notice of claim did not "explain the value attached by Plaintiffs to their emotional distress," "the dollar value of the loss of support claim," or even "the amount of funeral costs," it failed to comply with the statutory requirements. Accordingly, the district court granted summary judgment to Navajo County on the state law claims.

A

The Simmonses argue that Navajo County waived the affirmative defense of a deficient notice of claim by failing to raise the defense in its answer to their complaint, in violation of Federal Rule of Civil Procedure 8(c).[3]

---

[3]The Arizona Trial Lawyers Association's amicus curiae brief argues that Navajo County waived the defense by actively litigating the case on

**[17]** "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979); *see also In re Gayle Sterten*, 546 F.3d 278, 285 (3d Cir. 2008) (noting that "the proper focus of our inquiry" is whether framing the defense as a denial of an allegation "specifically deprived [the plaintiff] of an opportunity to rebut that defense or to alter her litigation strategy accordingly"). Although Rule 8 requires affirmative defenses to be included in responsive pleadings, absent prejudice to the plaintiff, the district court has discretion to allow a defendant to plead an affirmative defense in a subsequent motion. *See Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 827 (9th Cir. 1997); *see also Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984) (noting that "[o]ur circuit liberalized the requirement that affirmative defenses be raised in a defendant's initial pleading in *Healy Tibbitts Construction Co. v. Ins. Co. of N.A.*, 679 F.2d 803 (9th Cir.1982)").

**[18]** Here, Navajo County's answer denied the allegation that the Simmonses had complied with Arizona law in filing their notice of claim. In a motion for leave to amend the answer, Navajo County specifically argued that the notice of claim was insufficient and contained lengthy legal argument to that effect. The Simmonses addressed this argument in their response brief, which was cross-referenced in their response to Navajo County's motion for summary judgment. Under such circumstances, we are unpersuaded that the Simmonses lacked notice of this defense and suffered any prejudice. We

---

the merits for some twenty months prior to raising the defense in its motion for summary judgment. *See, e.g.*, *City of Phoenix v. Fields*, 201 P.3d 529, 536 (Ariz. 2009) (en banc) (holding that there was waiver in the case of a defendant who "has taken substantial action to litigate the merits of the claim that would not have been necessary had the entity promptly raised the defense" (internal quotation marks omitted)). However, "we decline to consider an argument raised only by [amicus] on appeal." *Chaker v. Crogan*, 428 F.3d 1215, 1220 (9th Cir. 2005).

thus conclude that Navajo County's answer adequately raised the defense.[4]

B

**[19]** At the time of the district court's decision, Arizona law was unclear as to what standard governs whether a notice of claim adequately states the "facts supporting" the amount claimed. *See Deer Valley*, 152 P.3d at 494 n.3 (expressly declining to reach this issue). However, after the district court's decision, the Arizona Supreme Court clarified the standard for determining whether a plaintiff's notice of claim has sufficiently alleged factual support for the claimed amount. *See Backus v. State of Arizona*, 203 P.3d 499, 505 (Ariz. 2009) (en banc). Therefore, we vacate the district court's order as to the state law claims and remand for reconsideration in light of *Backus*. Should the district court decline to exercise supplemental jurisdiction over the state law claims, it may remand those claims to state court for further proceedings, including the application of *Backus* in the first instance. *See Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1082 (9th Cir. 2003).

VI

For the foregoing reasons, the district court's order granting summary judgment to Navajo County is **AFFIRMED** in part, **VACATED** in part, and **REMANDED** for further proceedings.[5] Each party shall bear its own costs on appeal.

---

[4]The Simmonses also argue that Navajo County failed to comply with Federal Rule of Civil Procedure 9(c), which requires that a party denying that a condition precedent has been performed do so with particularity. Because they raise this argument for the first time on appeal, we decline to consider it. *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1053 (9th Cir. 2007). Nor do we consider their equitable estoppel argument, which is also raised for the first time on appeal.

[5]The motions of the Arizona Trial Lawyers Association and Arizona counties for leave to file amicus curiae briefs are granted, and the briefs are ordered filed.